[No. 316.   July 25, 1891.]

## DAVID C. PRYOR, APPELLEE, v. THE PORTSMOUTH CATTLE COMPANY, LIMITED, APPELLANT.

DAMAGES—TROVER—PLEA, GENERAL ISSUE—EVIDENCE.—In an action of trover for damages for an alleged conversion of certain cattle, where the defendant pleaded the general issue, and the evidence was: That three years before, plaintiff received, in accordance with an executory contract with certain parties for the purchase of the same, four hundred head of cattle to be of a certain grade and quality; that he accepted one hundred and eighteen, and put his brand upon them, but rejected the remainder, because not of the required grade; put them in a new brand, not his own; turned them loose upon the common range with other cattle of the vendors, and other parties; and notified the vendors, by mail, of his action in the matter, who paid no attention to his letter; that there was no further contract or arrangement between them; that two years afterward defendant purchased from the vendors all their cattle, excepting those rejected by plaintiff, and shipped a portion of the latter, without objection from plaintiff, who was at the time in defendant's employ, and asserted no claim to the cattle or their price until a year thereafter, when he found he had been charged with the price of them by the original vendors three years before, and testified that he thought they had sold them to certain other parties, who subsequently transferred them to defendant—Held: The evidence was not sufficient to show that the plaintiff was the owner of the cattle at the time of the alleged conversion, and therefore he had no right of recovery.

ID.—RECORDED BRAND—EVIDENCE—INSTRUCTION.—An instruction that a recorded brand is one of the modes of proving ownership, by brand, of property in this territory, and that when an animal is found bearing such brand, the jury may find, from that proof alone, that the animal belongs to the owner of the brand, was misleading, having assumed that the record of the brand had been proved, where the only evidence on that point was plaintiff's testimony that he did not know whether the brand had been recorded or not.

ID.—TITLE—INSTRUCTIONS.—An instruction that a verdict and judgment for plaintiff would operate to transfer his title to the cattle to defendant was clearly erroneous. An unsatisfied judgment in trover does not pass the property. It is a mere assessment of damages, on payment of which the property vests in the defendant. Benj. on Sales, p. 54, sec. 49.

APPEAL, from a judgment in favor of plaintiff, from the Fourth Judicial District Court, San Miguel County. Judgment reversed.

The facts are stated in the opinion of the court.

FRANK SPRINGER for appellant.

WILLIAM BREEDEN, M. W. MILLS, and E. A. FISKE for appellee.

O'BRIEN, C. J.—This is an action in trover brought by the appellee, David C. Pryor, in the district court of Colfax county, to recover of the appellant, the Portsmouth Cattle Company, the sum of $9,000 damages as the value of three hundred head of cattle, alleged to be the property of the plaintiff, and to have been unlawfully taken by the defendant company, and converted to its use. The defendant pleaded the general issue. The cause was tried to a jury, at the April term, 1886, of the district court of Colfax county, resulting in a verdict in favor of the plaintiff for $3,000. Defendant thereupon moved for a new trial upon the following grounds: · That the verdict is unsupported by the evidence; that it is contrary to the weight of evidence; that it is contrary to the instructions of the the court; that it is excessive; that there was no proof of a demand or refusal before suit; that the court erred in admitting upon the trial certain testimony over defendant's objections; that it erred in refusing to give certain instructions asked by defendant; that it erred in giving certain instructions excepted to by defendant; and lastly, that the verdict is against both the law and the facts. And thereupon, by agreement of parties, the venue was changed to San Miguel county, where on the third of December, 1886, the motion for a new trial was overruled, and judgment entered upon the verdict. A bill of exceptions was thereafter settled

and signed, and defendant took his appeal from such judgment to this court, where the same has since been pending. The principal facts in the case may be briefly stated as follows: In the winter of 1880, the plaintiff, David C. Pryor, contracted with the Pryor Brothers of Colorado, for the purchase of four or five hundred head of cattle of a certain grade and quality, to be delivered to him on his range in Colfax and Mora counties New Mexico. In the fall of 1881, Pryor Brothers drove their cattle from Colorado to Mora county, in this territory, and turned them loose upon the common or open range. That of the number so driven down, four hundred head were segregated from the herd, and tendered to plaintiff in accordance with his contract. That all of the cattle so turned over to him did not suit him. That they were not such as he had agreed to purchase. That in consequence he only accepted one hundred and eighteen of the number, which he branded in his individual brand, the "Comet," and the remaining two hundred and eighty-two head he put into a brand called the "3P," thinking and determining that they should go back to the Pryor Brothers as they were not the kind of cattle he liked. A few days afterward he wrote to one of the Pryor Brothers in Colorado that he had not received the kind of cattle that he wanted. Of those that he had put into the 3P brand, fifty were cows, and two hundred and thirty-two were steers, ranging from two to three years old. Plaintiff at this time, and up to the fall of 1882, was in the employment of Pryor Brothers. In the same year Pryor Brothers sold their cattle in New Mexico, but not those bearing the 3P brand, to Underwood, Clark & Company, who transferred their purchase to the defendant, the Portsmouth Cattle Company. In September, 1883, plaintiff was employed as supervisor or manager of their cattle by the defendant company. In the month of October following, the defendant com-

pany shipped under charge of plaintiff, four hundred head of steers from Raton, in Colfax county, to Kansas City, Missouri. This shipment was consigned to commission men in the name and for the benefit of Pryor Brothers, it being part of the contract between them and Underwood, Clark & Company, at the time the former sold the cattle to the latter, that Pryor Brothers were to market the beeves, and apply the proceeds towards the payment of notes given for a balance due on the purchase. In this shipment plaintiff saw from thirty-five to fifty or sixty steers in the 3P brand. He made no claim at that time to anyone for the value of these steers, nor did he assert any claim of ownership. For the first time, in the fall of 1884, one year after this consignment, plaintiff demanded payment for such cattle in the 3P brand as the defendant company had used or disposed of, but he is not certain whether he asked pay for all in that brand on the range. His reasons for not claiming such cattle were that he thought his brothers had sold them, and he says: "I wrote to him, and he never paid any attention to it, and I was charged with the cattle." He supposed, at the time, that his brothers, or one of the Pryor Brothers, had sold them to Underwood, Clark & Company. His testimony on this very important question is: "Question. State your name and residence. Answer. My name is David Pryor, and I live in Colorado. In 1880, up to 1883, I have lived in this county, and a portion of the time in San Miguel county. In 1882 I worked on this range, in this county and Mora county. In the fall of that year I received from my brother— He brought one hundred head of cattle from Colorado to New Mexico; in the fall of 1881, it was. I received four hundred head of cattle, which as my property I was to place in my individual brand. Up to this time I had no brand in Colfax or Mora counties. These cattle which my brother sent me were not the kind of

cattle in the bill that I liked, or he agreed to let me have. So I branded out of the four hundred head what I wanted, in my individual brand, which was the Comet 2 V's, and a bar directly behind it; V's pointing toward the head, one inside the other, and the bar directly behind it; and then the remainder of these cattle, which amounted to two hundred and eighty-two head, that I branded, I put in three P's, thinking and determining that they should go back to Pryor Brothers, as they were not the kind of cattle I liked. A few days after which time I wrote to one of my brothers—the one in Colorado, I think—that he had not sent me the kind of cattle I liked. Q. Well, how many cattle do you swear were in that herd in Raton, with the 3P brand on them? A. I think I can swear there were thirty-five. Q. That is as near as you can come to answering the question, is it? A. Yes, sir; I think it is. Q. (By a juror.) Did I understand you, you never sold the 3P brand at all? A. Never sold any 3P brand. Q. What has become of them? A. I don't know. Redirect examination by Mr. Breeden: Q. Now, Mr. Pryor, this last answer of yours, as to how many cattle you saw—state fully about the number of cattle you shipped up there,—the three P cattle. A. I stated in the first statement that I could swear as many as thirty-five, and in the next statement I said I could swear there was thirty-five. I would like to state, that being my property at that time, or should have been, I noticed them closer than I did other cattle. Q. Is that all? A. There was something else I omitted to state. The reason I didn't claim those cattle was because I thought my brother had sold them, and I wrote to him, and he never paid any attention to it, and I was charged with the cattle. Q. (By the court.) As I understand you, you supposed your brother had sold them. A. Yes, sir. Q. And when you came to settle for them, they had been carried into your account with them?

A. Yes, sir. Q. (By Mr. Breeden.) You supposed that your brothers had sold them with other cattle that they had sold? A. I supposed that he had sold them to Underwood, Clark & Company. I had very little dealings with my brothers for two or three years. I didn't see them only for a little while at a time. I had never seen the bills of sale, or contracts to Underwood, Clark & Company. Q. When you ascertained that your brothers had not sold that brand, what did you do? A. Why, I called on Mr. Holmes for a settlement in Kansas City. Q. Why did you call on Mr. Holmes? A. Because I knew he uséd some of the cattle, and I knew that they were claiming the brand. Q. Did you claim that Mr. Holmes got them? A. No; but the Portsmouth Cattle Company, through Mr. Holmes. Q. Then you called on Mr. Holmes as the manager of the Portsmouth Cattle Company? A. Yes, sir." He further on states that he had never had a bill of sale for the 3P brand of cattle, and never called on Pryor Brothers to settle with him for the price of the cattle as sold by them, for the simple fact that they didn't sell them.

The foregoing contains all of the substantial proof offered as to the conversion of certain cattle in the 3P brand, included in the shipment from Raton to Kansas City in the fall of 1883, as well as the principal parts of the testimony offered in support of plaintiff's ownership. Without further adverting to the proceedings on TROVER: general the trial, or discussing the various points issue: evidence. very ably presented by counsel in their respective briefs as to the several acts of the defendant company in reference to the cattle in controversy, we must determine from the evidence whether plaintiff has a right to bring this action against the defendant. If he had not, the conduct of the defendant in the premises must be immaterial to him, and that must determine the case as far as his rights are concerned.

Was he, at the time of his alleged acts of conversion, the owner of the property? He predicates his cause of action upon his unqualified ownership. The undisputed facts upon this important phase of the case appear to us simple and decisive. In the fall of 1881 he received, in accordance with the terms of an understanding or executory contract had with Pryor Brothers, of Colorado, four hundred head of cattle. He examined them, accepted only one hundred and eighteen of the number, and put them in his own recorded brand, the "Comet." The remaining two hundred and eighty-two he did not accept, because they did not suit him; were not such as he had bargained for; did not put them in the Comet brand, but put them in a new brand, not his own, for the purpose of identification; turned them loose upon the common range, where they mingled with other animals pasturing thereon belonging to Pryor Brothers and other parties; and at once notified Pryor Brothers by mail of his action in the premises. The latter paid no attention to his lettter. This conduct on the part of the plaintiff shows a consummated sale of the number of cattle accepted, if the vendors acquiesced, and as unmistakably shows a repudiation of any bargain or arrangement previously made in reference to the two hundred and eighty-two head, discarded by plaintiff, thus relieving himself from all legal liability therefor, whether the vendors acquiesced or not in plaintiff's act of repudiation. Plaintiff, then, did not become the owner of the two hundred and eighty-two head; did not accept, nor agree to accept, them at the time of the tender, in the fall of 1881.

The evidence fails to disclose any other dealings or transactions between him and the Pryor Brothers in respect to these cattle; no new agreement; no further delivery; no other acceptance; in fact, nothing except the persistent refusal of plaintiff to recognize the two hundred and eighty-two head as his own until

the fall of 1884, when he discovered that Pryor Brothers had him charged with the four hundred head. It does not appear that even then he assented to the propriety or legality of such charge, that he agreed to pay it, or in any way rendered himself liable to Pryor Brothers for the value of the rejected animals. In the fall of 1883 plaintiff was an employee of defendant, working on the same range; assisted in collecting and shipping for the defendant about four hundred head of cattle for sale to the Kansas City market; recognized in the number so shipped thirty-five, fifty, or sixty, in the 3P brand, a part of the two hundred and eighty-two rejected by him; saw them sold for more than $1,000; never asserting any claim to the animals or their price until a year thereafter, when he found that Pryor Brothers had him charged with all the cattle sent him three years before. During this period of three years he had believed, must have believed, that these 3P brand cattle were not his, for the simple reason that he had never accepted them. Then, there was no sale of these animals recognized by plaintiff during this period. The whole tenor of his conduct is in line with that theory. It is unreasonable, if not absurd, to suppose that any man of common sense would stand silently by, and even assist the perpetrators, while from one to two thousand dollars' worth of his property is being sold, and the proceeds taken by others. And what reason does he give for his strange conduct? He thought that Pryor Brothers had sold them to Underwood, Clark & Company, and that the cattle had subsequently been transferred by them to the defendant. Would he think this if he regarded himself as the purchaser—as the owner of the animals? There was no sale of the four hundred head in the fall of 1881, unless both parties assented. Plaintiff's conduct shows that he did not assent, and it further shows that until the fall of 1884 he believed that Pryor Brothers had recog-

nized the legal effects of such dissent. Aside from this, there is no proof of any subsequent consummated sale of these animals, nor of any ratification of prior negotiation in reference thereto. Hence we find that at the time of the alleged conversion the plaintiff was not the owner of the property, and therefore had no right of recovery, and the court below erred in refusing to grant defendant's motion for a new trial.

Defendant excepted to three of the twelve instructions given by the court to the jury. The first one had especial reference to the provision of the statute regulating the branding of animals, and declaring the legal effect thereof, when done in compliance with the statute. This instruction is quite lengthy, and we can only give portions of it: "Another section provides that brands may be recorded in the county where the owner resides; so that a party having an established brand may have it recorded either in the county where his cattle are liable to stray and range, or in the county where he resides, or in both, and when it is recorded under the provisions I have called your attention to, in that way it gives him a right to use the brand, and is one of the modes by which evidence of ownership by brand may be established. * * * Now, these provisions of the Compiled Laws of the territory that I have read to you constitute a statutory mode of raising prima facie evidence as to the ownership of property, and when a brand has been recorded under these sections that I have read to you, and in the manner provided in these sections, and that has been proven to the satisfaction of the jury, and an animal is found bearing such brand, the law then steps in, upon its being proven that the brand has been so adopted, and thus recorded by any particular person, and that the brand is on an animal, and provides that from that proof alone the jury are warranted in finding that animal belongs to the brand thus

RECORDED brand: evidence: instructions.

recorded and which it bears. Now, in this territory, that is one of the modes by which the ownership of property may be proven, and it is a proper mode, where all these facts are before the jury." This instruction is misleading. It assumes that the record of the brand may have been proved, when the only fact stated in that connection was plaintiff's answer that he did not know whether the 3P brand had been recorded or not. Such answer neither proves nor tends to prove the record of the brand. The rights of the parties should not be imperiled by an instruction of this nature, especially on so vital a point as the ownership of the property in question.

Defendant excepted also to the following instruction: "(7) A verdict and judgment for the plaintiff in this case would operate to transfer to the defendant the plaintiff's title in and to the cattle on account of the alleged conversion of which this suit is brought, and the defendant would thereby be entitled to hold any of said cattle as against the plaintiff, and as against the plaintiff would be held to be the owner of the same." This is plainly erroneous, and was well calculated to facilitate the labors of the jury in finding for the plaintiff. "An unsatisfied judgment in trover does not pass the property, and is a mere assessment of damages, on payment of which the property vests in the defendant." Benj. Sales, p. 54, section 49. As there may be a new trial of this case, it is not deemed necessary to pass upon the other errors alleged in the record. The judgment is reversed.

TITLE: instructions.

McFIE, LEE, and SEEDS, JJ., concur.