**Certiorari Denied, No. 31,591, April 22, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-054**

**Filing Date:   February 11, 2009**

**Docket No. 26,632**

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,**

> **Petitioner-Appellee,**

**v.**

**LANCE K.,**

> **Respondent-Appellant.**

**and**

**In the Matter of EMILY K., ARIEL K.,
and ZACHARY K., Children.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Tommy E. Jewell, District Judge**

**Children, Youth & Families Department**
**Simon Romo, Chief Children's Court Attorney**
**Rebecca J. Liggett, Children's Court Attorney**
**Santa Fe, NM**

**for Appellee**

**Law Offices of Nancy L. Simmons, P.C.**
**Nancy L. Simmons**
**Albuquerque, NM**

**for Appellant**

**Karen Cantrell**

1

**Placitas, NM**

**Guardian Ad Litem**

**OPINION**

**FRY, Chief Judge.**

**{1}** The opinion filed in this case on December 18, 2008, is withdrawn, and the following opinion is filed in its place.

**{2}** Father appeals from a judgment terminating his parental rights to his children Ariel and Zachary. He also appeals from the trial court's order requiring him to submit to a paternity test with respect to a third child, Emily, and, upon DNA testing establishing that he is not Emily's biological father, the order denying him continued visitation with Emily. We reverse the termination of Father's parental rights and affirm the orders related to Emily.

**BACKGROUND**

**{3}** The Children, Youth & Families Department (CYFD) filed a petition alleging abuse and neglect on April 2, 2002, and alleged that the family had been the subject of several prior referrals, that the family had been unable to eradicate an ongoing problem daughters Emily and Ariel had with lice, that Emily had serious mental health needs that the parents had been unable to address, and that both parents had substance abuse problems. The affidavit filed with the petition included details regarding the prior referrals. When the children were taken into custody, Emily was eight years old, Ariel was six, and Zachary was ten months old.

**{4}** Father pleaded no contest to the allegations of abuse and neglect in November 2002. Also in November 2002, the parents were divorced. CYFD's report at the time, which the trial court incorporated into its dispositional judgment, alleged that Emily disclosed that a friend of Father had digitally penetrated her, that she had numerous sexual encounters with boys, that Father had showed her an X-rated movie, and that she had overheard Mother having sex with a boyfriend. The report further alleged that Emily had been exhibiting increased aggression toward her siblings and increased sexual behavior.

**{5}** The report also maintained that Father would not "take any responsibility or acknowledge that there is a problem with the decisions he has made concerning his children," and alleged that Father had "compromised the best interest of his children" by distributing leaflets at Ariel's school apparently accusing CYFD of wrongfully holding the children in custody. The treatment plan required Father to provide CYFD with a list of relatives who would be willing to care for the children, pay $50 per month in child support, attend AA meetings three times per week, participate in an evaluation for psychiatric medication, participate in counseling, submit to a paternity test, have weekly visits with the children, participate in a domestic violence assessment, complete a drug/alcohol assessment, participate in the children's therapy sessions as recommended by the therapists, participate

in parenting classes, and submit to random urinalyses (UAs).

**{6}** By April 2003, the trial court approved changing the permanency plan from reunification to permanent guardianship with the children's maternal aunt. Father had complied with his treatment plan's requirements for counseling, visitation, psychological evaluations, AA attendance, clean UAs, and parenting classes, but his counselor reported that Father "is not committed to changing, [and] he does not engage in treatment sessions." On several occasions when Father and Mother were supposed to bring the children's lunch to a visitation session, the parents brought junk food. In addition, Father had apparently told Emily that she should not trust anyone at CYFD and that there were cameras set up in the visitation rooms. He also told Ariel not to tell anyone that she had lice and implied that having lice was her fault.

**{7}** Mother ultimately relinquished her parental rights to the children in May 2003. At the next permanency hearing in May 2003, the court approved changing the permanency plan to termination of parental rights and adoption. CYFD reported that Father had not had any positive UAs since the last hearing, he had paid $300 in child support, attended counseling sessions, successfully completed the required parenting classes, had a domestic violence assessment, and attended all visitation sessions. However, the counseling service "continue[d] to report that [Father] has no desire to change" and that "[i]t is difficult for [Father] to make substantial progress when he is unwilling to even admit that he might have some areas of his life that need 'work'." Emily reported that Father's friend had sexually assaulted her and that Father knew about it but allowed it. CYFD was going to investigate the allegations.

**{8}** CYFD filed a motion to terminate Father's parental rights in July 2003. As grounds for termination, the petition alleged that the children had been neglected or abused and that "the conditions and causes of the neglect or abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD]." These allegations constitute a claim under NMSA 1978, § 32A-4-28(B)(2) (2005). The petition then reviewed the progress of the case and repeated the allegations from the original April 2002 petition for custody regarding the girls' lice and Emily's mental health issues, Father's failure to participate in previous services provided to Mother, Father's alcohol and marijuana abuse problem, and Father's distribution of fliers at the children's school. At about the same time, the parties stipulated to a paternity test to determine the identity of Emily's father. The test revealed that Emily's biological father was someone other than Father, and her biological father relinquished his parental rights to Emily.

**{9}** At the next permanency hearing in November 2003, the court adopted CYFD's report, which stated that Father had made three child support payments, provided proof of his attendance at AA meetings, attended all visitation sessions, completed the victims' group for domestic violence, underwent a substance abuse assessment, and participated in a neuropsychological evaluation. However, the report noted that it had not yet received a report on Father's medication evaluation, that Father gave hard candy to Zachary despite

3

being told not to, and that Zachary choked on it. The report reiterated comments from the May 2003 report that the therapist had reported that Father was attending counseling but not engaging and that Father had told the girls not to report that they had lice.

**{10}** In February 2004, Father filed a motion to re-establish visitation with Emily. The trial court first ruled that Father does not have a liberty interest in a relationship with Emily because he is not Emily's biological father. However, the court ruled that Father would be allowed to prove that it would be in Emily's best interest to have a relationship with him. The trial court conducted thirteen hearings on the issue from December 2004 to December 2005.

**{11}** Meanwhile, CYFD filed an amended motion for termination of Father's parental rights, which added allegations that, if true, would establish that Father had presumptively abandoned the children in accordance with Section 32A-4-28(B)(3).

**{12}** Following the permanency hearing in November 2004, the special master found in his order that Father had not paid child support since October 2003, he was bringing high-sugar snacks to visits with the children, he had been providing the required UAs, and he had consistently visited the children. CYFD's report, which was incorporated into the order, stated that Father had provided all UAs, which were negative, that Father was attending psychotherapy sessions, and that his therapist reported that Father was "doing very well." The therapist further reported that Father "is able to recognize that he has made some poor choices regarding his personal life that have affected his children."

**{13}** The final permanency hearing orders from May 2005 and December 2005 contained similar findings. The May order found that Father attended AA meetings at least once a week and was approaching nine months of sobriety and that Father attended all visitation sessions, provided clean UAs, and participated in psychotherapy. The December order stated that CYFD had not received proof of Father's attendance at AA meetings in September and October and that Father had missed a few UAs. In both the May and December orders, the only negative findings regarding Father related to Father's refusal to accept responsibility for CYFD's having to take the children into custody in the first place. Also in December 2005, the trial court denied Father's motion for contact with Emily.

**{14}** The trial court held seven hearings on the motion for termination of parental rights from December 2005 through January 2006. On February 28, 2006, nearly four years after the children were taken into custody, the court entered its judgment finding that "[t]here is clear and convincing evidence that [Father's] parental rights to and of Ariel and Zachary . . . should be terminated." The court did not file findings of fact and conclusions of law on the issue of termination. This appeal followed.

**DISCUSSION**

**{15}** Father makes four arguments on appeal, contending that: (1) there was not clear and

4

convincing evidence to support a determination that the causes and conditions of neglect were unlikely to change in the foreseeable future; (2) the trial court abused its discretion when it applied the factors set out in *Tedford v. Gregory*, 1998-NMCA-067, 125 N.M. 206, 959 P.2d 540, in connection with the order requiring a paternity test and the order denying Father's motion for contact with Emily; (3) to the extent the testimony on inaudible tapes and/or CDs that was reconstructed by the parties is unsatisfactory, reliance on the reconstructed testimony violates Father's right to due process; and (4) the presiding judge should have recused himself. Because we conclude that substantial evidence does not support termination of Father's parental rights and reverse the judgment on that basis, we need not address the acceptability of the reconstructed testimony or the argument regarding recusal. We affirm the orders requiring the paternity test and denying Father contact with Emily.

## 1.      Sufficiency of the Evidence

**{16}**    The standard of proof for termination of parental rights is clear and convincing evidence. *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. Clear and convincing evidence is defined as evidence that "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct. App. 1995) (internal quotation marks and citation omitted). "The function of the appellate court is to view the evidence in the light most favorable to the prevailing party, and to determine therefrom if the mind of the factfinder could properly have reached an abiding conviction as to the truth of the fact or facts found." *In re Melissa G.*, 2001-NMCA-071, ¶ 12, 130 N.M. 781, 32 P.3d 790 (internal quotation marks and citation omitted).

**{17}**    As an initial matter, we observe that the trial court did not enter findings of fact and conclusions of law supporting its determination to terminate parental rights, despite the fact that Father filed requested findings and conclusions. There are a number of difficulties that arise from the trial court's failure to make specific findings. First, our rules require a court to file findings and conclusions when requested to do so. *See* Rule 1-052(A) NMRA (stating that "the court shall enter findings of fact and conclusions of law when a party makes a timely request"). Second, the absence of findings and conclusions hampers our ability to review the issues raised on appeal. *Cf. State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2007-NMCA-070, ¶¶ 23, 48, 141 N.M. 692, 160 P.3d 601 (remanding for entry of findings of fact because the record in the trial court was insufficiently developed to allow meaningful review). For example, we are unable to determine whether the trial court relied on Section 32A-4-28(B)(2) or (B)(3) in entering the judgment of termination.

**{18}**    We nonetheless decline to remand for entry of findings and conclusions under the particular circumstances of this case. It has now been over six years since CYFD took custody of the children from their parents, and we are loath to subject them to any more

delay in permanency than is absolutely necessary. In addition, the trial judge who presided over the numerous, lengthy hearings has retired, part of the record has been reconstructed, and remand would require a new judge to review the entire record in order to prepare meaningful findings of fact. We therefore rely on appellate presumptions to conclude that the trial court found all facts necessary to support termination of parental rights pursuant to all available theories. *See Reeves v. Wimberly*, 107 N.M. 231, 236, 755 P.2d 75, 80 (Ct. App. 1988) ("Upon a doubtful or deficient record, every presumption is indulged in favor of the correctness and regularity of the trial court's decision, and the appellate court will indulge in reasonable presumptions in support of the order entered."). Our task on appeal is to determine whether clear and convincing evidence supports termination under either Section 32A-4-28(B)(2) or (B)(3).

### a.    Evidence Supporting Termination Under Section 32A-4-28(B)(2)

**{19}**    A court may terminate a person's parental rights when the state proves by clear and convincing evidence that a child has been neglected or abused, and the court finds that the conditions and causes of abuse or neglect are unlikely to change in the foreseeable future despite reasonable attempts by CYFD. § 32A-4-28(B)(2). Although Father pleaded no contest in 2002 to the allegations of abuse and neglect, we agree with his argument that clear and convincing evidence does not support a determination that the conditions and causes of abuse or neglect are unlikely to change in the foreseeable future.

**{20}**    CYFD crafted an extensive treatment plan for Father that included therapy, classes, assessments, UAs, attendance at AA meetings, visitation with the children, and payment of child support. At the time CYFD took the children into custody, the major problem attributed to Father was his alcohol and marijuana dependency. Over the nearly four years between custody and termination, Father addressed this problem effectively. Virtually all permanency reports stated that Father's UAs were negative, and he regularly attended AA meetings. By the time the trial court terminated Father's rights, CYFD made no mention of any concern regarding Father's drinking. Father also complied with all other requirements of the treatment plan with the exception of the requirement for child support payments. It appears that Father made some but not all of the child support payments. Again, CYFD did not rely on Father's failure to make child support payments as evidence supporting termination.

**{21}**    In its brief on appeal, CYFD cites the following failures of Father in support of termination: (1) he did not understand the harm that had been done to Emily and Ariel, and (2) he did not take responsibility for his role in CYFD's taking the children into custody. We address each alleged failure in turn.

**Failure to Understand Harm Done to the Girls**

**{22}**    With respect to Father's failure to understand the harm that had been done to Emily and Ariel, CYFD points to Father's refusing to believe Emily's disclosure that Father's

6

friend Lloyd had sexually abused her, Father's minimizing of Emily's sexualized and aggressive behaviors, and Father's failure to productively participate in treatment team meetings. Regarding the incident involving Lloyd, Father testified that the family lived near Lloyd, who lived with his mother, his sister, and his brother, that the children played with Lloyd's brother's children, and that the two families socialized. Emily said nothing to Father about Lloyd's having acted inappropriately, and the first time Father learned about the accusation was after Emily made the disclosure in a safehouse interview in 2002 about an incident she alleged had occurred in 2000. Father subsequently ran into Lloyd and asked him about it, and Lloyd denied the allegation and offered to testify. Although the State investigated the allegation, the molestation has never been proved, as far as Father knows.

**{23}** As for Father's minimizing of Emily's sexualized and aggressive behaviors, Father testified that he thinks some children are more sexualized than others and that Emily may have been picking up cues from Mother. When asked what might have motivated Emily's tendencies to masturbate in public, sometimes with a Coke bottle, Father testified that he masturbated at a young age and that he understood that Emily may have overheard Mother having sex with her boyfriend. He also admitted to having let Emily watch a movie called "The Breast Men," which he did not consider to be pornographic and which did not show the sex act, but from which Emily may have pieced things together. He testified that in hindsight, he probably should not have let her see the movie. Emily's therapist testified that Father told her that she (the therapist) was overreacting to Emily's sexualized behaviors.

**{24}** Finally, CYFD contends that Father did not participate meaningfully in treatment team meetings. Emily's therapist testified that it was her understanding that Father did not trust CYFD and told Emily not to disclose things to her therapist or to social workers. A social worker who was assigned to work with the family in March 2002 testified that Father declined to work with her because he said the social worker was working with Mother. Another social worker testified that Father had distributed fliers regarding "freeing" the children and referencing Emily's "situation" in July 2002. A CYFD social worker testified that Father had initially participated in treatment team meetings about Emily, but that it was difficult to get him to focus on Emily's treatment. He appeared to be making fun of the team, and he suggested that Emily's self-destructive and aggressive behaviors were normal and that the team was blowing everything out of proportion. At about that time, a paternity test revealed that Father was not Emily's biological father, and the team determined that Father should not continue on the team.

**{25}** We have difficulty concluding that Father's conduct in these instances constituted clear and convincing evidence that the causes and conditions of neglect were unlikely to change in the foreseeable future. These behaviors related exclusively to Emily, who was ultimately determined not to be Father's biological child. CYFD observes that Father's conduct with respect to Emily may suggest how he parents Ariel and Zachary. While this may be true, there is no evidence suggesting that Ariel and Zachary have any of the mental health problems Emily had. *Cf. State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶¶ 17, 33-35,132 N.M. 299, 47 P.3d 859 (recognizing that a parent's

abilities may depend on whether child is normal or has specialized needs). Moreover, the conduct about which CYFD complains can be viewed as reflecting Father's mistrust of CYFD in general and his disagreement with CYFD's assessments regarding the validity of Emily's allegation about Lloyd—which was never substantiated—and the source of Emily's sexualized behavior. While Father's assessments in this area may have been naive or demonstrated imperfect judgment, we cannot say that they "instantly tilt the scales" toward a fact finder's abiding conviction that Father is unable to be an adequate parent to Ariel and Zachary. Many perfectly adequate parents sometimes exhibit naivete and imperfect judgment.

{26}    In addition, much of Father's conduct about which CYFD complains, such as his reaction to Emily's accusation regarding Lloyd, his showing Emily the movie, and his non-participation in the treatment team's effort, occurred several years prior to termination of his rights. Consequently, "[the] evidence was stale for the purpose of determining whether those conditions persisted at the time of the hearing or would persist into the future." *State ex rel. Dep't of Human Servs. v. Natural Mother*, 96 N.M. 677, 679, 634 P.2d 699, 701 (Ct. App. 1981).

**Failure to Take Responsibility for the Causes of CYFD's Taking Custody**

{27}    CYFD also relies on Father's refusal to take responsibility for the conditions that caused CYFD to take the children into custody in the first place. In the permanency reports from November 2002, April 2003, and May 2003, CYFD noted that Father's counselor had reported that Father was not committed to change or willing to accept responsibility for anything that had happened. The next report in November 2003 reiterated the counselor's report from May 2003. However, in the November 2004 report, CYFD noted that Father's counselor had reported that Father was "doing very well" and that he was "able to recognize that he has made some poor choices regarding his personal life that have affected his children."

{28}    Dr. Montoya testified that Father did not take any responsibility for the children's being in CYFD custody. Social worker Heather Carrica offered the same opinion and stated that Father said he was a perfect parent being pursued by CYFD because CYFD did not agree with his political views. However, Father's therapist testified that she had seen Father make positive behavioral changes, that he was learning skills to manage his moods, and that he had made good progress.

{29}    The conditions that brought the children into custody were the girls' lice infestations, Emily's mental health issues, and the parents' substance abuse problems. Apparently the lice were brought under control because they were not mentioned after the April 2003 permanency report. Emily continues to deal with mental health issues; according to the December 2005 report, she had been diagnosed with attention deficit/hyperactive disorder, depression, and post traumatic stress disorder. However, a paternity test established that Father is not Emily's biological parent, and Father has had no contact with Emily since at

least February 2004.  Father has resolved his substance abuse issues and, as of May 2005, he had been sober for nine months.  Thus, the conditions that caused CYFD to take custody of Father's two biological children—the lice and Father's substance abuse—have been resolved.

**{30}**    Although there is certainly evidence that Father does not take complete responsibility for the children's being in CYFD custody, the evidence also establishes—and CYFD does not dispute—that Father took responsibility for and gained control over the primary impediment to adequate parenting, which was his substance abuse problem.  The girls' 2002 lice infestation and Father's failure to admit responsibility for it do not, in our view, constitute grounds for termination of Father's parental rights.

**{31}**    CYFD's real complaint about Father appears from the record to be his willingness to leave the children in Mother's care around the time CYFD took custody in 2002, when Mother was clearly having difficulty coping.  Many of CYFD's questions of Father at the various hearings revolved around this situation.  Father testified that he was trying to juggle school and work and that he sometimes had to leave the children with Mother.  There was evidence that Mother was intermittently dependent on drugs and that she engaged in prostitution at times, although Father denied knowing that any of these things were happening during the times he left the children with Mother.

**{32}**    Again, CYFD relies on stale evidence.  Even if Father exhibited bad judgment in leaving the children with Mother and even if he was unable to get the girls' lice under control, these events occurred in 2002, nearly four years before the trial court terminated Father's parental rights.  The opinions expressed by Dr. Montoya and the social worker Carrica that Father was unwilling to accept responsibility were based on stale information as well.  Dr. Montoya saw Father in 2003, a little over two years prior to termination.  Although Carrica was the supervising social worker on the case the entire time, her testimony at the July 5, 2005, termination hearing appeared to be simply a reiteration of her testimony at the permanency hearing on February 18, 2003. Carrica appeared to disregard the more recent reports by Father's therapist that Father was "able to recognize that he has made some poor choices regarding his personal life that have affected his children" and that she had seen Father make positive behavioral changes.

**{33}**    In our view, this case bears close resemblance to three of our prior decisions:  *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, 144 N.M. 222, 185 P.3d 1072, *cert. denied*, 2008-NMCERT-004, 144 N.M. 48, 183 P.3d 933, *State ex rel. Children, Youth & Families Dep't v. Joseph M.*, 2006-NMCA-029, 139 N.M. 137, 130 P.3d 198, and *Natural Mother*.  In *Hector C.*, we held that there was insufficient evidence to support a finding that the causes and conditions of neglect were unlikely to change in the foreseeable future because the father was incarcerated at the time the children were taken into custody and for almost two years after that.  *Id.* ¶¶ 1-2, 8.  CYFD failed to present the opinion of any expert "based on [the f]ather's current situation and on new information that had become available since [the testifying psychologist's] evaluation." *Id.* ¶ 19.  Like Father

in the present case, the father in *Hector C.* complied with his treatment plan after his release and made significant progress toward change. *Id.* ¶ 20.

**{34}** In *Joseph M.*, the father made progress and successfully resolved his substance abuse problems, just as Father has done here. 2006-NMCA-029, ¶¶ 10-12. While the father in *Joseph M.* had some continuing problems similar to those emphasized by CYFD in the present case, such as failure to appreciate the seriousness of his children's having witnessed domestic violence, difficulty picking up on his children's cues, and difficulty relating to the children, *id.* ¶ 13, we nonetheless reversed the termination of his parental rights. CYFD had treated both parents as a unit even though it was the mother who had more serious problems and who made no progress in her treatment plan. *Id.* ¶ 10. In support of termination of the father's rights, CYFD pointed to the father's unwillingness to raise the children without the mother. *Id.* ¶ 19. We noted that CYFD never told the father that his unwillingness to separate from the mother could be a basis for termination of his rights. *Id.* ¶ 20.

**{35}** Finally, in *Natural Mother*, after the children were taken into custody, the mother divorced the father, who drank and could not hold down a job, she obtained a job and adequate housing, worked out a future plan, and complied with her agreements with the department having custody. 96 N.M. at 678-79, 634 P.2d at 700-01. The evidence in support of terminating the mother's parental rights related to events prior to the time the children were taken into custody. *Id.* at 679, 634 P.2d at 701. We concluded that the evidence "was stale for the purpose of determining whether those conditions persisted at the time of the hearing or would persist into the future." *Id.* We reversed the termination of the mother's rights, noting that "[s]he ha[d] not been afforded the opportunity to demonstrate what kind of a parent she would be today." *Id.* at 681, 634 P.2d at 703.

**{36}** The facts in the present case are similar to the salient facts in the three cases just discussed. Like the parents in *Joseph M.* and *Natural Mother*, Father complied with his treatment plan in virtually every significant respect, including the successful resolution of his substance abuse problems. And, as in *Hector C.* and *Natural Mother*, the evidence CYFD relied on was somewhat stale. In contrast to this dated evidence, the court-appointed Rule 11-706 NMRA expert, Candace Kern, testified regarding an attachment study of Father and the three children that she conducted *after* Dr. Montoya evaluated Father. Dr. Kern's report concluded that "Ariel is able to express a shy joyfulness at being with her father . . . [and s]he is desirous of being close to him." Dr. Kern also concluded that, although Zachary was taken into custody when he was only ten months old, his "attachment with his father is positive. He is immediately comfortable . . . [and] regards his father as a warm, friendly person who wants to interact with him." Dr. Kern opined that Father was "openly affectionate" with the children, "interested in what they said and did, and responsive. . . . He has the capacity to interact with others with love, and empathy, and to modulate his feelings." Finally, Dr. Kern stated that both Ariel and Zachary were "positively attached" to Father, and that "[i]t is detrimental to deprive [Children] of this emotional relationship."

**{37}** In light of Father's substantial compliance with his treatment plan and progress

toward change, we cannot say that CYFD presented clear and convincing evidence that the causes and conditions of neglect were unlikely to change in the foreseeable future. We recognize that the extremely long time the children were in custody may have motivated CYFD to recommend termination, given how well the children were doing in their foster home. However, "[t]he fact that a child might be better off in a different environment is not a basis for termination of parental rights in this state." *Patricia H.*, 2002-NMCA-061, ¶ 21 (internal quotation marks and citation omitted). **{38}** We also wish to express our concern with the conduct of this case. We see no justification for the extremely long delay between the taking of custody and the termination of Father's parental rights. The trial court approved changing the permanency plan to termination/adoption in July 2003, but termination did not occur until nearly three years later. The trial court held a total of thirteen hearings on Father's motions related to maintaining his relationship with Emily and seven hearings on the motion for termination. Some of the evidence at these hearings was duplicative. While we fully appreciate the fundamental importance of providing parents with due process in such proceedings, surely the proceedings could have been streamlined and abbreviated in some fashion without doing violence to the rights of any of the parties. That Father was able to maintain a positive relationship with the children during this inordinate delay is a testament to his determination to continue to parent the children.

**b.      Evidence Supporting Termination Under Section 32A-4-28(B)(3)**

**{39}** There being insufficient evidence to support termination under Section 32A-4-28(B)(2), we consider the other possible ground for termination. Under Section 32A-4-28(B)(3), a court may terminate parental rights based on presumptive abandonment if

> the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise and the following conditions exist:
>
>          (a)      the child has lived in the home of others for an extended period of time;
>
>          (b)      the parent-child relationship has disintegrated;
>
>          (c)      a psychological parent-child relationship has developed between the substitute family and the child;
>
>          (d)      if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;
>
>          (e)      the substitute family desires to adopt the child; and
>
>          (f)      a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been

11

rebutted.

*Id.*

**{40}** Although there is arguably evidence that would support findings (a), (c), and (e), CYFD failed to present evidence supporting a finding that the relationship between Father and the children Ariel and Zachary has disintegrated. Even if there were such evidence, Dr. Kern's testimony regarding the attachment and relationship among the three effectively rebuts that evidence. We therefore conclude that clear and convincing evidence does not support termination under this part of the statute.

**c.      The Best Interests of the Children**

**{41}** Because we are reversing the judgment of termination, our decision raises the prospect of tremendous emotional upheaval in the lives of the children, who have lived in a foster home since April 2002. By the same token, however, Father has been deprived of contact with his children since his parental rights were erroneously terminated in February 2006. As we noted in *Benjamin O.*, "[w]hile we are cognizant of the fact that [the children are] not a trophy to be awarded to whichever party prevails in court, we also are sympathetic to the fact that, but for the erroneous [termination of Father's parental rights], he might not be in the position that he is now." 2007-NMCA-070, ¶ 38. It is clear that the district court is in the best position to determine the present circumstances of the children and Father and to balance the emotional interests of the children and Father's rights. Therefore, we remand this case to the district court to determine how best to proceed. We look to the statutory provisions of the Abuse and Neglect Act (the Act), NMSA 1978, §§ 32A-4-1 to -34 (1993, as amended through 2005), for assistance in providing guidance to the district court on how it is to proceed. *See Benjamin O.*, 2007-NMCA-070, ¶ 34 (turning to Abuse and Neglect Act to determine the appropriate procedure following reversal of an adjudication of abuse or neglect).

**{42}** When a district court determines that a child has been abused or neglected, the court proceeds to enter a dispositional order determining who will have custody of the child and ordering CYFD to implement and the child's parent to cooperate with an approved treatment plan. § 32A-4-22(B), (C). This dispositional order is then subject to periodic judicial reviews, § 32A-4-25, and the court holds regular permanency hearings. § 32A-4-25.1 (1997), *amended by* 2005 N.M. Laws ch. 189, § 50.[1] In permanency hearings following the initial permanency hearing, the operative rebuttable presumption is that "the child's best interest will be served by changing the child's permanency plan to provide for adoption of the child, emancipation of the child, permanent guardianship for the child or long-term foster care for the child." § 32A-4-25.1(E).

---

[1] We rely on the version of Section 32A-4-25.1 that was in effect when CYFD initially filed its petition in April 2002.

12

**{43}** Here we reach the crux of the matter in this case. At the permanency hearing,

> [i]f sufficient evidence is presented to rebut, by a preponderance of the evidence, the presumption set forth in Subsection E of this section, the court shall order one of the following dispositions:
>
> (1) dismiss the case and return the child to his parent, guardian or custodian; or
>
> (2) return the child to his parent, guardian or custodian, subject to those conditions and limitations the court may prescribe, including protective supervision of the child by the department and continuation of the treatment plan for not more than six months.

§ 32A-4-25.1(G). This statutory scenario comes close to approximating what has occurred here. Our reversal of the district court's termination of Father's parental rights is in many ways the equivalent of a rebutted presumption favoring adoption. Consequently, the alternative dispositions mandated in Section 32A-4-25.1(G) are persuasive indications of what should happen on remand.

**{44}** Because of the lengthy separation of Father from the children, outright dismissal may not be the appropriate course at the outset. *See Benjamin O.*, 2007-NMCA-070, ¶ 35 (noting that "automatic return of a child to his or her parent following a reversal of an adjudication of abuse or neglect is [not] necessarily in the child's best interests, particularly where . . . the parent has not had actual custody of [the c]hild for a number of years"). Instead, the district court may retain jurisdiction over the case and proceed to determine how best to reunify the children with Father. Toward that end, the district court and CYFD should put a transition plan in place. *See id.* ¶ 38 (stating that because separation between the child and her father was likely the result of the court's erroneous adjudication of abuse or neglect, "the district court and CYFD must actually put a transition plan in place in order to attempt to return [the c]hild to [the f]ather"). The goal of the plan is the orderly transfer of custody from CYFD to Father while keeping in mind the best interests of the children.

**{45}** In the transition plan, the district court may impose whatever limitations it deems appropriate to ease the transition of the children back to Father's custody. § 32A-4-25.1(G)(2). However, continuation of the treatment plan would not be an option in light of the fact that Father substantially complied with his treatment plan. In addition, the statute contemplates a transition of no more than six months, and this appears to us to be a reasonable time for paving the way for reunification. But we recognize that this is not the precise situation contemplated in Section 32A-4-25.1(G) and that there may be circumstances of which we are not aware that would make a six-month transition inadvisable for the children. We leave the length of the transition period to the district court's assessment of what would be reasonable under the circumstances.

13

**{46}** The transition plan may identify methods and resources CYFD can utilize to assist Father and the children in reestablishing a bond. We expect CYFD and Father to cooperate in the creation and implementation of the plan in good faith. If, on the other hand, CYFD becomes aware of extraordinary circumstances counseling against reunification of Father with the children, CYFD may file a motion seeking to retain custody of the children.

**{47}** The Court in *In re Adoption of J.J.B.* explained what constitutes extraordinary circumstances and developed a process for determining whether extraordinary circumstances warrant depriving a parent of custody. 119 N.M. 638, 651-54, 894 P.2d 994, 1007-10 (1995). First, if the non-parent party (here, CYFD) establishes that extraordinary circumstances exist, the presumption favoring custody in the natural parent is rebutted. *Id.* at 652, 894 P.2d at 1008. Examples of extraordinary circumstances are laid out in *In re Adoption of J.J.B.* and include significant alteration of the parent's fitness evidenced by "gross misconduct such as incapacity, moral delinquency, instability of character, or inability to provide [the children] needed care." *Id.* at 654, 894 P.2d at 1010. If CYFD establishes such misconduct by clear and convincing evidence, then it should retain custody. But even if Father is deemed fit, "the court should determine whether, taking into account all factors, [Father] is capable of reestablishing a healthy parent-child bond with [the children]. If, despite the development of a psychological parent-child relationship between the [foster] parents and the child[ren], a psychological parent-child relationship can be restored between [Father] and the child[ren], then granting custody to [Father] is in the best interests of the child[ren]." *Id.* By the same token, if CYFD can establish by clear and convincing evidence that a parent-child relationship cannot be restored, then custody should remain in CYFD.

**{48}** If CYFD does not challenge the return of custody to Father or if CYFD raises such a challenge but fails to prove extraordinary circumstances by clear and convincing evidence, then implementation of the transition plan and the ultimate reunification of Father and children should continue.

**{49}** We encourage the district court to make use of mediation in determining the details of the transition plan and to assist in the plan's implementation. While it is clear that the parties in this case differ as to the resolution of issues, we believe that they all want to do what is best for the children. With this in mind, mediation may be a viable option. The district court may want to explore this possibility. Additionally, the Court of Appeals has a mediation program, and the parties may want to take advantage of this service.

## 2. The Orders Related to Emily

**{50}** Father also challenges the trial court's order requiring him to submit to a paternity test with respect to Emily and, following a determination that Emily is not Father's biological child, the order denying his request for continued contact with Emily. For the following reasons, we affirm these orders.

### a. Jurisdiction

14

**{51}** As an initial matter, we address CYFD's argument that we do not have jurisdiction because Father did not timely file notices of appeal from the order requiring the paternity test and the order denying contact with Emily. We do not agree. A timely notice of appeal is not jurisdictional; rather, it is a mandatory precondition to the exercise of appellate jurisdiction. *Govich v. N. Am. Sys., Inc.*, 112 N.M. 226, 230, 814 P.2d 94, 98 (1991). In addition, it is well settled that failure to timely file a notice of appeal from either an adjudication of abuse or neglect or an order terminating parental rights constitutes ineffective assistance of counsel per se, such that the merits of an appeal will be considered notwithstanding the procedural deficiency. *See State ex rel. Children, Youth & Families Dep't v. Amanda M.*, 2006-NMCA-133, ¶ 22, 140 N.M. 578, 144 P.3d 137 (holding that where notice of appeal from an adjudication of abuse and neglect is filed late, this Court will presume that counsel was ineffective and accept jurisdiction over the appeal); *State ex rel. Children, Youth, & Families Dep't v. Lorena R.*, 1999-NMCA-035, ¶ 10, 126 N.M. 670, 974 P.2d 164 (extending the conclusive presumption of ineffective assistance of counsel to TPR cases in which notice of appeal is untimely filed). Although constitutional interests are not at stake with respect to the trial court's orders related to Emily, who is not Father's biological child, we elect to exercise our discretion to consider Father's issues on their merits. *See Govich*, 112 N.M. at 230, 814 P.2d at 98 (explaining that an appellate court has discretion to hear an appeal if a party has failed to comply with mandatory rules governing the time for filing a notice of appeal).

### b.      Order Requiring Paternity Test

**{52}** Early in the proceedings, CYFD suggested that there be a paternity test to determine whether Father is Emily's biological father, apparently because Father had indicated on at least two prior occasions that there was some doubt on the matter. Father objected on the grounds that he is presumed to be Emily's father under the laws of paternity and that the alternative would leave Emily with no father. The trial court noted that vacillation can be harmful to children and ordered the test, which established that Emily's biological father was Rex Smith, who later relinquished his parental rights to Emily.

**{53}** On appeal, Father argues that in ordering the test, the trial court improperly applied the factors set out in *Tedford*, 1998-NMCA-067, ¶¶ 14-15. We do not agree. Despite Father's initial objection to the paternity test, the only pleading in the record that reflects the trial court's order on the matter recites that the parties stipulated to the paternity test. Father therefore waived his objection to the test. *See Salas v. Mountain States Mut. Cas. Co.*, 2007-NMCA-161, ¶ 26, 143 N.M. 113, 173 P.3d 35 (explaining that "waiver is the intentional relinquishment or abandonment of a known right" (internal quotation marks and citation omitted)), *cert. granted*, 2007-NMCERT-012, 143 N.M. 213, 175 P.3d 307.

### c.      Order Denying Contact With Emily

**{54}** When DNA testing established that Emily is not Father's biological child, Father filed a motion seeking continued visitation with Emily. Following a hearing, the trial court

determined that Father does not have a liberty interest in Emily but that he would be allowed to prove that it would be in Emily's best interest to have a relationship with him. The trial court then conducted thirteen evidentiary hearings on Father's motion to maintain contact with Emily. The parties filed requested findings of fact and conclusions of law, and the trial court entered its own findings and conclusions, in which it determined that Father had failed to establish that it was in Emily's best interest to maintain contact with him. We review the trial court's determination for abuse of discretion. *See* NMSA 1978, § 32A-4-22(E) (2005) ("The court may order reasonable visitation between a child placed in the custody of [CYFD] and . . . any other person who may significantly affect the child's best interest, if the court finds the visitation to be in the child's best interest.").

**{55}**     On appeal, Father does not challenge the trial court's determination that he has no liberty interest in a relationship with Emily. Instead, Father argues that the trial court improperly imposed the burden of proof on Father and failed to give enough weight to the favored status the law bestows on non-parents who have a custodial or other "family-like" relationship with a child.

**{56}**     We first observe that Father has not challenged any of the trial court's findings of fact and conclusions of law supporting the denial of his motion for contact with Emily. He has therefore waived any claim that the trial court's findings are not supported by substantial evidence. *See* Rule 12-213(A)(4) NMRA (stating that "[a] contention that a verdict, judgment or finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence"). We therefore turn to the arguments Father has made.

**Imposition of Burden of Proof**

**{57}**     The parties apparently agreed that the factors set out in *Tedford* regarding assessment of the best interests of the child would govern the trial court's determination of whether Father could maintain contact with Emily. Father contends that *Tedford* says nothing about who has the burden of proof and, therefore, it was improper for the trial court to impose the burden on Father.

**{58}**     *Tedford* was a paternity case in which an adult filed an action against her putative father seeking a determination of paternity and recovery of retroactive child support. 1998-NMCA-067, ¶¶ 1, 9. The putative father argued that the trial court should have considered the best interests of the petitioner before ordering a paternity test, relying on a Washington case that set out factors to consider, including "'the stability of the present home environment, the existence or lack thereof of an ongoing family unit, the extent to which uncertainty of parentage already exists in the child's mind, and any other factors which may be relevant in assessing the potential benefit or detriment to the child.'" *Id.* ¶ 14 (quoting *McDaniels v. Carlson*, 738 P.2d 254, 262 (Wash. 1987) (en banc)). This Court in *Tedford* concluded that a best-interests assessment was unnecessary because the petitioner was an adult and had brought the paternity action herself, and it observed that such an assessment

16

"is applicable in a paternity or retroactive child support action only when the child involved in such proceeding is a minor and has developed a close emotional attachment to the presumed parents." 1998-NMCA-067, ¶¶ 16-17. Consequently, *Tedford* did not have to consider who would bear the burden of proof in a best-interests assessment. As a result, the absence of a discussion regarding the burden of proof does not persuade us that Father should not have had the burden in the present case.

**{59}** We conclude that Father bore the burden because he filed the motion for contact. Grandparents seeking visitation have the burden of proving that visitation is appropriate, *Senaida C.*, 2008-NMCA-007, ¶ 20, and it makes sense that any other interested person seeking visitation with a child should be required to do the same.

### Deference to Father's Closeness to Emily

**{60}** Father next argues that the trial court should have given consideration to his status as Emily's custodian, which he contends conferred on him a "favored right to placement and visitation." He relies on broad concepts of the notion of "family" found in New Mexico and United States Supreme Court case law and on certain provisions of the Abuse and Neglect Act.

**{61}** We rejected both of Father's arguments in *Senaida C.* In that case we observed that the Abuse and Neglect Act does not confer a right to visitation on anyone. *Senaida C.*, 2008-NMCA-007, ¶¶ 12-13. To the contrary, the Act states that "[t]he court *may* order reasonable visitation between a child placed in the custody of [CYFD] and . . . any other person who may significantly affect the child's best interest, if the court finds the visitation to be in the child's best interest." § 32A-4-22(E) (emphasis added). The trial court here did not find visitation with Father to be in Emily's best interest.

**{62}** Also in *Senaida C.* we rejected the argument that a grandparent is afforded greater rights due to the United States Supreme Court's recognition of a broadly defined notion of "family" in *Moore v. City of East Cleveland*, 431 U.S. 494, 504-05 (1977). *Senaida C.*, 2008-NMCA-007, ¶ 17. Father also relies on *Moore* and on New Mexico cases that appear to acknowledge a similarly broad concept of family. *See Hill v. Cmty. of Damien of Molokai*, 1996-NMSC-008, ¶¶ 7, 19, 21, 121 N.M. 353, 911 P.2d 861 (interpreting expansively the term "family" in a restrictive covenant precluding use of property "for any purpose other than single family residence purposes" and concluding that group home for people with AIDS did not violate the covenant); *In re Doe*, 100 N.M. 92, 95, 666 P.2d 771, 774 (1983) (opinion on cert.) (observing that "family" has many definitions). Father contends that his long, close relationship with Emily should give him rights under the Abuse and Neglect Act similar to the rights afforded biological parents.

**{63}** We fully appreciate that a family can comprise persons who are not related by blood. Nonetheless, an expanded notion of family does not create rights that are not otherwise recognized by law. Under the Abuse and Neglect Act, the trial court had the discretion but

was not required to order continued visitation between Father and Emily, and the court gave Father the opportunity to persuade it that visitation was in Emily's best interest. Father was unable to convince the trial court, and we cannot say that the trial court's decision was an abuse of discretion.

**CONCLUSION**

**{64}**  For the foregoing reasons, we reverse the judgment terminating Father's parental rights to Ariel and Zachary and remand for a determination of who should have custody of the children. We affirm the trial court's orders requiring the paternity test and denying Father continued visitation with Emily.

**{65}  IT IS SO ORDERED.**

**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

**CELIA FOY CASTILLO, Judge**

**MICHAEL E. VIGIL, Judge**

**Topic Index for *State of NM ex rel CYFD v. Lance K.*, No. 26,632**

| | |
|---|---|
| **CD** | **CHILDREN** |
| CD-CC | Children's Code |
| CD-TR | Termination of Parental Rights |
| CD-PS | Psychological Evaluation |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CN | Child Abuse and Neglect |
| | |
| **DR** | **DOMESTIC RELATIONS** |
| DR-PT | Paternity |
| | |
| **EV** | **EVIDENCE** |
| EV-CL | Clear and Convincing Evidence |