This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

     Petitioner-Appellee,

v.                                     **No. A-1-CA-36890**

**KRYSTAL R.,**

     Respondent-Appellant,

and

**JOEL and KIM WEBER,**

     Intervenors,

**IN THE MATTER OF JUDE R.,**

     Child.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Steven Blankinship, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Lori Gibson, P.C.
Lori G. Willard
Ruidoso, NM

for Intervenors

Erinna M. Atkins
Alamogordo, NM

Guardian Ad Litem

**DECISION**

**ATTREP, Judge.**

**{1}** Krystal R. (Mother) appeals the district court's termination of her parental rights to Jude R. (Child). For the reasons that follow, we affirm.

**BACKGROUND**

**{2}** Child is a medically fragile child, suffering from several conditions including hydrocephalus, requiring placement of a shunt in his head and insertion of a feeding tube at birth, Down syndrome, and cerebral palsy. As a result, Child has vision problems, mobility issues requiring leg braces, difficulty verbalizing and communicating, gross motor issues, oral aversion, and feeding and eating difficulties. These conditions require Child to be cared for twenty-four hours a day and to attend numerous doctors' appointments across the state in order to properly manage his health.

**{3}** On June 27, 2013, the New Mexico Children, Youth and Families Department (CYFD) took custody of Child, seven months old at the time, after receiving two separate allegations that Child was starving. The abuse and neglect petition alleged that Mother had removed Child's feeding tube against medical advice and had refused to allow medical professionals into her home to provide necessary care for Child. The petition further alleged that Mother had failed to bring Child in for weekly check-ups, which was problematic because Child was diagnosed with failure to thrive and weighed under ten pounds when he should have weighed twice that.

**{4}** Mother pleaded no contest to the charge of abuse and neglect, as defined by NMSA 1978, Sections 32A-4-2(B)(1), (E)(2) (2009, amended 2018) (re-codified at NMSA 1978, Section 32A-4-2(G)(2) (2018), of the Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2019). The district court found that Mother "has unresolved parenting issues, as well as the possibility of undiagnosed mental health issues, and lacks the parenting skills necessary to safely parent [Child] and meet his medical needs." The district court adopted a treatment plan requiring Mother to, among other things, "participate in a psychological [evaluation] and follow recommendations." Given Child's medical needs, the treatment plan also required that

Mother attend a minimum of ninety-five percent of Child's medical, dental, and developmental appointments and be able to discuss issues and concerns with medical staff and CYFD personnel. After being taken into CYFD custody, Child was placed with foster parents, Joel and Kim Weber, and Mother was granted visitation with Child at the discretion of CYFD.

{5}     In February 2017, after the case had been pending nearly four years, the district court denied CYFD's request to change the permanency plan from adoption to reunification, and CYFD subsequently requested a hearing on its motion to terminate parental rights (TPR). The two-day TPR hearing was held in November 2017. Mother was present as well as Child's foster parents. Relevant testimony from the TPR hearing is summarized below.

{6}     The CYFD permanency planning worker (PPW), Gina Vigil, testified first. She served as the PPW for the two years leading up to the TPR hearing. Despite the permanency plan remaining adoption, Ms. Vigil continued reunification efforts up until the TPR hearing. Ms. Vigil described the various requirements of Mother's treatment plan. Although Mother was compliant with several requirements, she was not in compliance with the most critical aspect of her plan—i.e., attending ninety-five percent of Child's medical appointments and engaging with Child in developmental therapies at the New Mexico School for the Blind and Visually Impaired (NMSBVI). Specifically, Ms. Vigil testified that Mother failed to attend any medical appointments from February 2017, after the permanency hearing, to the date of the TPR hearing, though she had been provided notice of all appointments. And Mother failed to participate in Child's feeding therapy, provided as part of his speech therapy at NMSBVI, which was important in ensuring Child ate. Mother also was non-compliant with the requirement that she follow the recommendations made in a psychological evaluation. Mother was diagnosed with chronic anxiety and an adjustment disorder in May 2016, and the diagnosing doctor recommended that Mother engage in psychotherapy, but Mother refused to do so.

{7}     Ms. Vigil further testified that Mother had recently regressed in her participation with CYFD and seemed resistant to sharing information, which was concerning given Child's medical frailty. Ms. Vigil also discussed safety concerns she had with Grandmother providing care for Child. Ms. Vigil testified that Grandmother lives in Mother's home, and that Mother identified Grandmother as the main caregiver for Child when Mother is at work, a plan with which CYFD did not agree. Grandmother herself has an in-home care provider for an unknown reason, has refused to be evaluated by CYFD to ensure her fitness to care for Child, and has engaged in behavior toward foster parents that resulted in the issuance of a restraining order against her.

{8}     CYFD called Dr. Marc Caplan as an expert at the TPR hearing. Although he did not evaluate anyone in relation to the case, he gave generalized testimony about attachment and bonding in the context of a special needs child. He testified that transitioning such a child away from his primary attachment figures could result in

significant regressive behaviors. The Webers had previously been identified as Child's primary attachment figures.

**{9}** Jennifer Lara, Child's teacher at NMSBVI, testified next. Ms. Lara testified that Child requires one-on-one attention in class due to his various conditions. Although Mother had been to the school three times in the late fall to observe Child in the classroom and at his orthopedic therapy, she did not come to the school in August or September; nor had Mother ever attended any school functions, such as field trips or talent shows. Importantly, during the 2017-2018 school year, Mother had not contacted the school to learn about any therapies that she should be implementing in her home to assist with Child's development.

**{10}** Dolores Lamb, a senior PPW at CYFD, testified about two visits she made to Mother's home in August and October 2017 with Ms. Vigil. Ms. Lamb recalled Mother was unable to answer any questions regarding Child's food preferences, which was concerning given Child's difficulties with feeding and eating. At these visits, Ms. Lamb noted that Mother was oppositional towards her and Ms. Vigil.

**{11}** Next, CYFD called Joel Weber, Child's foster father, to testify. Mr. Weber explained when Child came into his home, his head was locked to one side, his eyes were fixed, his arms were fixed to his chest, and he was unable to cry or make any sound. Mr. Weber testified at length regarding Child's progress since coming into the Weber home. He explained that Child requires around-the-clock care and cannot stand or do anything else on his own. Mr. Weber is primarily responsible for taking Child to all his medical appointments and explained Child's medical appointment schedule, which totaled eight so far in 2017. Of those eight appointments, Mother only attended the two dental appointments. Mr. Weber does not believe that Mother understands Child's needs, nor does he believe Child would be safe in Mother's home. Finally, Mr. Weber and his wife Kim Weber both testified that they would like to adopt Child.

**{12}** Kristen Huddleston, a medical assistant at Pediatrics of Alamogordo, testified next. Child has been a patient of hers since his birth. Over the years, Ms. Huddleston has seen Mother at various appointments, but believes Mother does not understand Child's medical needs and is concerned Child would not receive necessary medical care if he were returned to Mother.

**{13}** Patti Grier testified on behalf of Mother. Ms. Grier is the counseling director at Children in Need of Services (CHINS). Ms. Grier provides mental health therapy to children and families. Ms. Grier was accepted as an expert witness in the area of infant mental health at the TPR hearing. CYFD referred Mother and Child for services at CHINS in 2013, and Ms. Grier provided mental health services to Mother and Child since the referral. Ms. Grier focused on providing parenting guidance and therapeutic support to Mother and Child during their visits and fostering attachment and bonding between Mother and Child. Mother and Child completed therapy with Ms. Grier in 2016, but Ms. Grier continued to see them occasionally. According to Ms. Grier, Mother has owned up to the mistakes she made that brought Child into the system and has a really

good understanding of Child's disabilities. Ms. Grier believes that Mother does not face any more challenges than any other parent taking care of a high-needs child. Ms. Grier was unaware that, in the nine months leading up to the TPR hearing, Mother had missed several of Child's medical appointments. Ms. Grier never observed Mother at any doctors' appointments and did not know about Mother's ability to communicate with doctors.

**{14}**     Mother testified on her own behalf. Mother testified to the circumstances that brought Child into care, stating she realizes now that removing Child's feeding tube was not the right thing to do. Mother testified that she was not compliant with the treatment plan for a period time at the beginning of the case. Mother is on probation for felony child abuse charges stemming from the circumstances that brought child into CYFD custody and is compliant with probation. Mother currently lives in a rental home with Grandmother and her other son, who was seven years old at the time of the TPR hearing. Mother recently changed jobs to be more available for Child and now works at a fast food restaurant thirty-two to forty-two hours per week. Mother had not informed CYFD about her change in employment.

**{15}**     Regarding her treatment plan, Mother testified that she completed therapy sometime in 2016, and she believed further therapy was only required once Child was brought back into her home. With respect to Child's medical appointments, Mother testified that she could not attend some appointments because she either could not get off work or did not have enough gas money. Mother later admitted that she spends roughly one hundred dollars a month on cigarettes and that she could "probably" use that money to get to Child's appointments. When asked, Mother was unable to name several of Child's medical providers or his Molina Healthcare contact.

**{16}**     After the TPR hearing, the district court, in its written order, stated that there was clear and convincing evidence that Child was abused and neglected based on Mother's no-contest plea. Based on the evidence presented, the district concluded that CYFD had met its burden to "demonstrate[] that the causes of neglect or abuse were unlikely to change in the foreseeable future" and terminated Mother's parental rights to Child. This appeal followed.

## DISCUSSION

**{17}**     Before a district court terminates a parent's rights with respect to a neglected or abused child, CYFD must show by clear and convincing evidence that "the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." Section 32A-4-28(B)(2); *see also State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833 (stating that the burden of proof for termination of parental rights is clear and convincing evidence). "Clear and convincing evidence is defined as evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's

mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (alteration, internal quotation marks, and citation omitted). "We will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact finder could properly determine that the clear and convincing standard was met." *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted).

**{18}** Mother does not contend that CYFD failed to make reasonable efforts to assist her, but instead argues that CYFD "failed to show that Mother had not ameliorated the causes and conditions of neglect, and would not do so in the foreseeable future." While Mother asserts that she "challenges" a number of factual findings, she fails to explain why the identified findings are not supported by substantial evidence, and we thus decline to evaluate her assertions. *See State v. Fuentes*, 2010-NMCA-027, ¶ 29, 147 N.M. 761, 228 P.3d 1181 ("[W]e do not review unclear or undeveloped arguments [that] require us to guess at what [a party's] arguments might be."); *Murken v. Solv-Ex Corp.*, 2005-NMCA-137, ¶ 14, 138 N.M. 653, 124 P.3d 1192 ("[W]e decline to review . . . arguments to the extent that we would have to comb the record to do so."). We therefore accept the district court's factual findings and turn to Mother's other arguments as to why the district court erred. *See* Rule 12-318(A)(4) NMRA (stating that a party's argument "shall set forth a specific attack on any finding, or the finding shall be deemed conclusive").

**{19}** First, citing *In re Mary L.*, 1989-NMCA-054, 108 N.M. 702, 778 P.2d 449, and *State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2007-NMCA-070, 141 N.M. 692, 160 P.3d 601, Mother contends that the district court erred by relying on her failure to comply with her treatment plan in terminating her parental rights. Reliance on these cases is inapt. In *Mary L.*, we held that evidence of a mother's failure to comply with a non-court mandated treatment plan during a period when CYFD wrongfully took custody of her children was insufficient, standing alone, to support an adjudication that she neglected her children. 1989-NMCA-054, ¶¶ 17-19. Unlike this case, *Mary L.* involved an appeal from an adjudication of neglect. *Id.* ¶ 1. As noted, Mother pleaded no contest to the charge of abuse and neglect. Furthermore, Mother was court-ordered to comply with her treatment plan. Mother provides no authority for the proposition that a district court cannot rely on a parent's failure to participate in a court-ordered treatment plan as evidence in terminating parental rights, and we assume none exists. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329. Moreover, our Supreme Court recently affirmed a termination of parental rights where the district court considered a father's failure to comply with his court-ordered treatment plan. *See State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 54, 421 P.3d 814 ("[T]he [district] court found that [the f]ather did not substantially comply with his court-ordered treatment plan. . . . We will not disturb the district court's findings." (internal quotation marks omitted)); *see also State of N.M. ex rel. Children, Youth & Families Dep't v. Athena H.*, 2006-NMCA-113, ¶ 9, 140 N.M. 390, 142 P.3d 978 (considering a parent's compliance with treatment plan in assessing a parent's progress in addressing the causes and conditions of the abuse or neglect).

**{20}**     Reliance on *Benjamin O.* is no more helpful to Mother. In *Benjamin O.*, this Court reversed the underlying finding of abuse and neglect. 2007-NMCA-070, ¶ 13. Under those circumstances, we clarified that it would be improper to rely on the father's non-compliance with a treatment plan to prove that he was an abusive or neglectful parent in the first instance. *Id.* ¶ 41. Here, Child was validly adjudicated an abused and neglected child after Mother pleaded no contest to the allegations, and Mother's treatment plan was based upon this finding of abuse and neglect. Accordingly, it was not improper for the district court to consider Mother's level of compliance with her court-ordered treatment plan in assessing whether the conditions and causes of the neglect and abuse were likely to change in the foreseeable future.

**{21}**     Second, citing *State ex rel. Children, Youth & Families Dept. v. Alfonso M.-E.*, 2016-NMCA-021, 366 P.3d 282, Mother contends that the district court incorrectly shifted the burden of proof from the CYFD to her. Unlike *Alfonso M.-E., see id.* ¶ 37, however, there is no indication in the record that the district court shifted the burden to Mother in this case. In fact, in its order terminating parental rights, the district court clarified that the burden was on CYFD to "offer evidence . . . (1) [about the] abuse and neglect of [Child], (2) [about] the attempts made by CYFD to ameliorate the conditions leading to the abuse and neglect, and (3) that despite these efforts, that [Mother] failed to make changes, such that, (4) the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future." Because the district court did not impermissibly shift the burden of proof, we find no error.

**{22}**     Third, Mother advances several arguments purportedly based upon *Lance K.*, 2009-NMCA-054. In *Lance K.*, this Court held that, despite some remaining concerns about the father's behavior, there was not clear and convincing evidence that the conditions and causes of neglect were unlikely to change in the foreseeable future because of the father's substantial progress. *Id.* ¶¶ 30, 37. In so doing, this Court rejected CYFD's presentation of evidence as stale because it concerned events that took place years before the termination hearing. *Id.* ¶¶ 26, 32. We also noted that CYFD's complaints about the father's reaction to certain department recommendations could be "viewed as reflecting [the f]ather's mistrust of CYFD in general and his disagreement with CYFD's assessments." *Id.* ¶ 25. Finally, we clarified that "the fact that a child might be better off in a different environment is not a basis for termination of parental rights in this state." *Id.* ¶ 37 (alteration, internal quotation marks, and citation omitted).

**{23}**     None of these propositions, however, are helpful to Mother. The vast majority of the evidence presented concerned the ten months leading up to the TPR hearing, and thus was not stale. Unlike *Lance K.*, the district court heard ample evidence that Mother had not made substantial progress with critical aspects of her court-ordered treatment plan, and thus Mother's mistrust of CYFD is no excuse for her failure to comply. Finally, the district court was very clear in its order that it was not comparing Mother's home with the foster parents' home, stating "[a] parent's rights may not be terminated simply because a child might be better off in a different environment." Accordingly, Mother's reliance on *Lance K.* is misplaced.

**{24}** What is more, there is substantial evidence of a clear and convincing nature that the conditions and causes of the neglect—namely Mother's lack of awareness and inability to attend to Child's medical needs—were unlikely to change in the foreseeable future. The district court determined that, even though Mother's treatment plan had been in place since October 2013,

> serious deficiencies continue to remain related to: (1) attending 95% of [Child's] medical, dental, and developmental appointments and being able to discuss issues and concerns related to his healthcare; (2) sufficiently attending school functions and understanding [Child's] education and development needs; (3) engaging in psychotherapy; (4) failing to discuss the extent and dependency of her relationship with [Grandmother] and providing CYFD with sufficient information to assess [Grandmother's] ability as a proposed backup care provider to [Child]; (5) adequately recogniz[ing] Mother's own involvement in the causes and conditions that brought [Child] into the [S]tate's care; and (6) maintaining appropriate interaction, discipline and supervision to CYFD staff and/or providers and communicating and cooperating with those providers in order to properly work the treatment plan.

The district court provided that "[t]he uncontroverted testimony is that [Child] has significant medical issues that will persist for many years, some for his lifetime, which require regular visits to numerous medical providers." The court emphasized, "of the utmost concern for the [c]ourt, is [Mother's] lack of participation and involvement in [Child's] healthcare needs and medical appointments[,]" stating "[i]t is unacceptable that [Mother] has rarely attended [Child's] medical appointments in 2017." Additionally, Mother never made appointments to meet with Child's service providers and had not engaged with Child's therapies at the NMSBVI. The district court credited Ms. Vigil's testimony that Mother "has not met the medical needs of [Child]," and Ms. Huddleston's testimony "that to this day [Mother] still does not understand [Child's] care." Ms. Lamb and Mr. Weber further testified they had concerns that Mother would be unable to meet the demands of raising a medically fragile child. Finally, Mother failed to complete recommended psychotherapy as ordered by her treatment plan.

**{25}** Reviewing the evidence in the light most favorable to the judgment, we conclude that substantial evidence supports the district court's determination that the conditions and causes of the neglect were unlikely to change in the foreseeable future. *See Keon H.*, 2018-NMSC-033, ¶ 54 (affirming a termination of parental rights where the district court considered the father's inability to meet the child's "highly specialized needs"); *State ex rel. Children, Youth & Families Dep't v. Raymond D.*, 2017-NMCA-067, ¶ 19, 404 P.3d 15 (considering evidence regarding the father's "inability to attend to [his c]hild's special needs" in affirming a termination of his parental rights); *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶¶ 33, 39 132 N.M. 299, 47 P.3d 859 (affirming termination of the mother's parental rights where the child had specialized needs requiring a high level of care and the mother had stopped participating in services).

**CONCLUSION**

**{26}** For the foregoing reasons, we affirm the district court's judgment terminating Mother's parental rights to Child pursuant to Section 32A-4-28(B)(2).

**{27}   IT IS SO ORDERED.**

**JENNIFER L. ATTREP, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**MEGAN P. DUFFY, Judge**