**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: June 8, 2017

**NO. 35,064**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH AND FAMILIES**
**DEPARTMENT,**

      Petitioner-Appellee,

v.

**DONNA E. and HARLEY E.,**

      Respondents-Appellants,

**IN THE MATTER OF SARAI E. and STEPHEN E.,**

      Children.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Raymond L. Romero, District Judge**

Children, Youth & Families Department
Charles E. Neelley, Chief Children's Court Attorney
Rebecca J. Liggett, Children's Court Attorney
Santa Fe, NM

for Appellee

The Frith Firm
Gilbert Houston Frith
Trace L. Rabern
Santa Fe, NM

for Appellants

Office of Hobbs City Attorney
Michael H. Stone
Hobbs, NM

Guardian Ad Litem

**_OPINION_**

**SUTIN, Judge.**

{1}     This case involves an appeal from a ruling terminating the parental rights of Respondents Harley E. (Father) and Donna E. (Mother). Although the New Mexico Children, Youth and Families Department (CYFD) petitioned to have Respondents' parental rights terminated as to two of Respondents' children, one boy and one girl (Children, separately Son and Daughter), the district court ultimately terminated their parental rights only as to Daughter on the ground that they presumptively abandoned her, pursuant to NMSA 1978, Section 32A-4-28(B)(3) (2005). Despite only terminating Respondents' rights to Daughter and not Son, and although those rights were terminated on the basis of presumptive abandonment, the district court nevertheless entered extensive findings of fact and conclusions of law regarding abuse suffered by both Children.

{2}     On appeal, Respondents argue that: (1) there was no finding and there is no evidence to support a finding that Respondents caused the disintegration of the parent-child bond with Daughter, thus rebutting the presumption of abandonment under Section 32A-4-28(B)(3); (2) upholding presumptive abandonment violates Section 32A-4-28 and due process because the deterioration of the parent-child relationship in this case was caused by CYFD that wrongfully alleged Respondents

produced or consumed child pornography and relied on that allegation to justify, seek, and obtain a no-contact order that prevented Respondents from having contact with Children for years; (3) the district court based its findings that Respondents abused Son on stale and unconfronted hearsay statements; (4) there is no clear and convincing evidence that Respondents directly abused Son or participated in the sexual abuse of Son; and (5) CYFD should pay all attorney fees of Respondents as a sanction for the delay and bad faith handling of this case.

{3} We agree with Respondents that there were no findings by the court as to the cause of the disintegration of their bond with Daughter and that there is no evidence in the record to support a finding that Respondents caused the disintegration. We therefore hold that Respondents successfully rebutted the presumption of abandonment. Based upon our reversal of the abandonment determination by the district court and our remand for further proceedings, it is unnecessary for this Court to address Respondents' due process argument at this time. We therefore reverse the termination of parental rights. However, because the paramount concern in this case is the best interest of Daughter, we remand the case with instructions for additional consideration as to custody.

{4} Because the judgment from which Respondents appeal terminated their rights only as to Daughter on a theory of presumptive abandonment, we need not and do not

address Respondents' evidentiary arguments about the testimony and findings and conclusions regarding Son or any abuse or neglect of Children. We also decline to order that CYFD pay Respondents' attorney fees.

**BACKGROUND**

{5}	As noted by Respondents in their brief in chief, this case involves a "five-year odyssey." For the sake of understanding the magnitude of the delays and issues in this case, we find it necessary to provide a comprehensive procedural history and factual background.

{6}	In April 2010, Son, then six years old, disclosed to his elementary school principal, Gail Bryant, that his older brother, H.J., then eighteen years old, sexually penetrated him. This disclosure came after months of Son acting out sexually at school and after Bryant had spoken to Mother about his inappropriate behavior. Bryant testified that she discussed Son's behaviors in person with Mother. Mother indicated to Bryant that she did not know how to handle Son's sexual behaviors and disclosed to Bryant that she knew that when Respondents were not at home, H.J. and Son watched pornography together. Bryant recommended putting a block on the computer or removing the computer's keyboard in an effort to limit access, but Mother did not respond positively to either recommendation.

{7}     After Son disclosed the abuse, Bryant called CYFD, and the Hobbs Police Department became involved. Bryant reported to the police that Son disclosed to her that he had told Father what H.J. had done to him. When interviewed by the police, Son disclosed that H.J. "humped [him] in the butt" and that it had happened on more than one occasion. The police interviewed H.J., and H.J. "confessed to sexual penetration of his brother on two occasions about a year and half [prior]." Father was also interviewed and denied knowing anything about the abuse. The police informed Father that H.J. could no longer have access to Son and Daughter, and Father agreed that they would find somewhere for H.J. to stay. The police also informed Mother that H.J. could no longer have access to his younger siblings, and Mother said that she would reach out to her father to see if H.J. could stay with him. H.J.'s maternal grandfather later arrived at the police station and confirmed with officers that H.J. could stay with him for as long as needed.

{8}     Ten days after H.J. and Respondents were interviewed, Son was interviewed at a Safe House. During the interview, Son disclosed that he had seen H.J. "make . . . the family dog[] suck his penis." He also stated that "Bubba humped me in my butt and it started bleeding." Following the Safe House interview, the police determined that it would be appropriate to schedule an examination by a Sexual Assault Nurse Examiner (SANE). Mother accompanied Son to the examination. There were no

4

physical findings during the examination, but during the interview, Son again disclosed that H.J. had sexually assaulted him. According to the SANE, during the examination Son began masturbating and, after telling Son to stop, Mother commented "[i]sn't he hung?" Son also stated during the interview that "[w]e have taken pictures of privates, and we print them off upstairs."

{9}	As a result of Son's disclosure during the SANE examination regarding naked pictures, the Hobbs Police Department received a search warrant from the Office of the District Attorney to collect various electronic and storage devices from Respondents' home. When the police arrived at Respondents' home, H.J., who was not supposed to be in the family home, answered the door. Mother, Son, and Daughter were also in the home. A CYFD worker was called to the home, and upon entering the home, noticed that it was filthy and in an unsanitary living condition. Children were taken into custody. Daughter was two years old at the time she was taken into CYFD custody.

{10}	As a result of the foregoing, an abuse or neglect petition was filed on June 15, 2010. In the petition, CYFD alleged that Son and Daughter were (1) abused children, pursuant to NMSA 1978, Section 32A-4-2(B)(1) (2009, amended 2016); (2) neglected children, pursuant to Section 32A-4-2(E)(2) (current version at Section 32A-4-2(F)(2)); and (3) neglected children, pursuant to Section 32A-4-2(E)(3)

(current version at Section 32A-4-2(F)(3)). In August 2010, Respondents entered pleas of no contest with respect to all of the allegations in the petition. As part of their pleas, Respondents agreed to comply with a proposed disposition and treatment plan submitted by CYFD.

{11} The district court held its initial judicial review on September 8, 2010. In its initial judicial review hearing order, the court found that Respondents had each "made sufficient effort to comply with the treatment plan[] and . . . to maintain contact with . . . [C]hildren." However, the court also stated that it was in the best interests of Children that custody remain with CYFD.

{12} The district court held judicial review hearings in October and November 2010 and found that Respondents had made sufficient efforts to maintain contact with Children, but had made insufficient efforts to comply with the treatment plan. In its January 2011 judicial review hearing order, the court found that Respondents had each made sufficient efforts to attend services and comply with the treatment plan, but had not made significant progress. The court ordered that the parties participate in a family centered meeting.

{13} The district court held the initial permanency hearing in February 2011. During the hearing, the court found that Children would not be returned home until the FBI completed its investigation of Father's computer. It was discussed that Son required

6

a higher level of care, but that Daughter apparently would transition home within thirty to sixty days. The court found that Respondents had made sufficient efforts to comply with the treatment plan but neither had made progress toward alleviating or mitigating the causes necessitating removal of Children. The court ordered a permanency plan of reunification but ordered that Children were not to transition home until Respondents had made sufficient progress and the court had reviewed the transition plan. The court also ordered that Son, who had previously been placed with Daughter, be placed in a residential treatment facility.

{14} Over the next three months, the district court continued to find that Respondents were not making sufficient progress. Although visits with Son were suspended in May 2011 due to Respondents' behavior during visits, the court found that "[a]s to [Daughter], . . . [CYFD] feels [Respondents] have made substantial progress toward eliminating the problem that caused [Daughter's] placement in foster care; it is likely [Daughter] will be able to safely return to [Respondents'] home within three months; and [Daughter's] return to [Respondents'] home will be in [Daughter's] best interest."

{15} In June 2011, the district court found that Respondents each made sufficient efforts to comply with and cooperate in the treatment plan, although there were no

7

findings regarding Respondents' progress. Daughter was transitioning home, and Respondents were having unsupervised overnight weekend visits with her.

{16} On July 19, 2011, a permanency hearing was held. Although we have neither an audio recording of the hearing nor a transcript, a summary filed by the district court indicates that the court appointed special advocate or a detective from the Hobbs Police Department assigned to the case informed the court that some of the images found on the computer were possibly child pornography. At that point, all contact between Respondents and Children ceased. The permanency review hearing was continued until August 16, 2011.

{17} At the August 16, 2011 permanency review hearing, the court found Respondents had made sufficient effort to participate in their treatment plan but continued to be unaware of their responsibility for the reason Children came into custody. It noted that all visits were to be cancelled on July 6, 2011, and specifically stated that there was to be no contact between Respondents and Children moving forward. The permanency plan was changed from reunification to adoption.

{18} Following the permanency plan change, Respondents' attorney withdrew, and Mother and Father retained separate counsel. Judge Gary Clingman, who had previously presided over the case, recused himself, and the matter was reassigned to Judge William Shoobridge.

{19} CYFD filed a motion for termination of parental rights on September 27, 2011. In support of its motion, CYFD alleged that Respondents had not made sufficient progress to allow Children to be safely returned to them in the foreseeable future. The motion specifically highlighted the fact that Respondents were unable to protect Children from H.J. and refused to acknowledge their responsibility to protect Children and to take responsibility for what occurred. CYFD noted the lack of supervision and the concerns about pornography on the computer. CYFD also alleged that due to the lack of supervision, Son suffered from sexual abuse, and Son attempted to molest Daughter. Mother responded to the motion and filed a counterpetition to the motion to terminate parental rights. In her counterpetition, Mother argued that she had complied with all CYFD requirements and court orders and demanded contact, visitation, and physical access to Children "to avoid damage to the [parent-child] relationship." Father followed suit.

{20} The hearing on the motion for termination of parental rights was set to begin on January 3, 2012. However, CYFD moved to continue the hearing because the attorneys for CYFD had a scheduled training in Albuquerque, New Mexico that day. The court continued the hearing, and it was eventually reset to begin July 23, 2012.

{21} The next permanency hearing took place in March 2012. The district court ordered that the permanency plan would continue to be adoption, that CYFD's legal

9

custody would be extended for an additional year, and that the no-contact order would remain in effect.

{22} A pretrial conference was held in June 2012. During the proceeding, counsel for the parties discussed meeting to view the images found on Respondents' computer at the Hobbs Police Department. The district court ordered that counsel be allowed to have supervised access to the computer images.

{23} Later that month, Respondents filed a motion for summary judgment. In their motion, Respondents highlighted their cooperation and compliance and the fact that visitation was suspended and had been suspended for almost one year. They argued that, after viewing the evidence, it could not be concluded by the Hobbs Police Department that the images were, "by clear and convincing evidence[,] child pornography." Because the motion for termination and the cessation of visitation were based on the notion that Respondents viewed and possessed child pornography and because there was not clear and convincing evidence that child pornography was on the computer, Respondents argued that summary judgment was appropriate.

{24} Attached to the motion for summary judgment was a report from the Hobbs Police Department documenting the meeting wherein counsel viewed the images of possible child pornography. The report indicated that the meeting took place on June 22, 2012. The report stated that there were five images that "the [Regional Computer

10

Forensics Laboratory] identified as possible child pornography, and . . . that [the New Mexico] Center for Missing [and] Exploited Children [(NMCMEC)] reported that these images were not matches to their database, and therefore, could not be identified as child pornography." The report also noted that the images were sent to Dr. Leslie Strickler, as requested by NMCMEC.[1] The pornographic images were found in a folder titled "Harley 2," and the only webcam images tied to that folder were of H.J. The report stated that the "majority of the registry entries did not have a corresponding webcam image, so the users of these logins cannot be determined to be exclusively used by those listed[.]" The report also indicated that no criminal charges would be filed and that because there was no additional evidence to be processed, the Hobbs Police Department's involvement concluded. CYFD did not file a written response to the motion for summary judgment until thirty-three months later, in March 2015.

{25}    Although the parties met on July 23, 2012, i.e., the date for which the termination hearing had been set, that hearing was not held. During the hearing, the

---

[1] Although the report indicates that the images were sent to Dr. Strickler and although Detective Mark Munro from the Hobbs Police Department testified during the termination of parental rights hearing that a forensic pathologist could analyze body structure of an individual in a photograph and opine as to whether or not that individual was under the age of eighteen, neither party cites to and we are unable to locate any testimony about any such analysis actually having taken place in this case.

11

CYFD attorney informed the district court that Dr. Parsons, a necessary expert witness, was experiencing a medical emergency and would not make it to the hearing. According to CYFD, it could not put on a case without Dr. Parsons' testimony, and the attorney requested that the court continue the hearing. The court granted the oral motion for continuance and opted instead to use the time allotted to determine whether visitation should occur. The court heard testimony from Blair Kemp, the therapist at the Guidance Center of Lea County (the Guidance Center) where Respondents were receiving treatment; Adrianna Catano, the program manager at Family Time Visitation Center, who witnessed some visits between Respondents and Daughter; Father; Ruth Macy, the therapist who had been working with Son and Daughter; and Robin Huffman and Barbara Timm, both who had worked with Son at the residential treatment facility where Son was placed. The court ultimately ruled not to change visitation. It ordered that releases be signed so that the providers could communicate and emphasized the need for providers in this case to confer before the termination of parental rights hearing. The termination hearing was reset to begin on September 13, 2012. And again, the termination hearing had to be rescheduled because Dr. Parsons was unavailable.[2]

---

[2] It was later represented during the termination of parental rights hearing that Dr. Parsons had passed away.

{26} From September 2012 to February 2013, none of the parties made any movement on the case. However, a status conference was held in February 2013 at which CYFD informed the district court that the plan for CYFD was now reunification. The court entered its subsequent permanency order in March 2013. In its order, the court appointed Ted Wooldridge as the family therapist to assist with the goal of family reunification. The parties were to provide complete disclosure of therapeutic and evaluative records to Wooldridge, and Wooldridge was to "control the various aspects of the family therapy intervention including timing and duration of client contacts, parent and child visitation, contact with providers and ongoing services recommendations." The court also stated that "[g]rounds do not exist for termination of parental rights because existing evidence is insufficient to meet the burden of proof." The permanency plan was changed to reunification and legal custody of the children was extended for another year.

{27} In June 2013, Respondents filed a motion for specific instructions for reunification. Respondents argued that they had not seen Children since July 2011, and the continued delay was causing "further emotional damage" to Children and Respondents. They argued that CYFD had not made a good faith effort to reunite Children with Respondents and requested attorney fees, tax, costs, and medical

expenses. They also requested an immediate hearing during which the district court could enter specific instructions to CYFD for reunification.

{28} A judicial review hearing was set for August 2013. Son's therapist, Marla Anaya, reported that she had one family session during which she noticed that Respondents needed to work on their marriage. The hearing was continued for "approximately [sixty] days in order to allow additional time for therapists to meet with the parties." The next hearing was set for November 2013. During the November 2013 hearing, the court indicated that the plan would remain reunification and would not adopt any changes. A judicial review/subsequent permanency hearing was set for December 2013.

{29} During the December 2013 hearing, the district court found that adoption was appropriate. In changing the permanency plan, the court found that Respondents had "complied with recommendations of the treatment plan in effect, but also [found] that causes and conditions of neglect and abuse may still exist, moreover, given the amount of time . . . [C]hildren [had] remained in custody, and the testimony given at [the December 2013] hearing, a change of plan to termination of parental rights/adoption appear[ed] to be in the best interest of . . . [C]hildren." The court appointed a Rule 11-706 NMRA expert and ordered that Respondents submit to Minnesota Multiphasic Personality Inventory testing. The court ordered that Dr.

14

Christopher J. Alexander administer the test. If Dr. Alexander was unable to serve, the court ordered that Dr. Marc A. Caplan be appointed to administer the test. However, the court also ordered that Respondents may choose to have an expert of their choice administer the test. The court discontinued joint therapy between Respondents and Son.

{30} The case was reassigned four times. A subsequent permanency hearing was set for January 15, 2015, and the termination of parental rights hearing was set for February 27, 2015.

{31} CYFD filed its amended motion for termination of parental rights on January 15, 2015. In the amended motion and as grounds for termination of the parental rights of Respondents, CYFD argued that (1) Children were abused and neglected, and the conditions and causes of the abuse or neglect were unlikely to change in the foreseeable future, despite reasonable efforts by CYFD; and (2) Daughter had been placed in the care of others and the conditions outlined in NMSA 1978, Section 32A-5-15(B)(3) (1995), existed. As with its original motion to terminate parental rights, CYFD alleged Respondents failed to protect Children and did not provide appropriate supervision. CYFD also alleged that Children's therapists indicated that Respondents' contact with Children resulted in Children acting out, that Son acted out sexually and attempted to and expressed a desire to molest Daughter, that Daughter had difficulty

15

drawing appropriate boundaries in her interactions with others, that Respondents failed to address the issue of pornography in the home or carefully supervise and show appropriate concern for Children's well being, that prior interactions with Respondents and Children made it unlikely that Respondents could successfully parent Children, and that Respondents' failure to address sexual issues of their elder son, H.J., indicated a pattern of failing to recognize and take sexual abuse and predation seriously.

{32}    Respondents filed their answer to the amended motion for termination of parental rights and filed a countermotion for reunification and reintegration of Children. In their countermotion, Respondents specifically requested an order reunifying and reintegrating Daughter, and reunifying and reintegrating Son, subject to physical custody of Son for services by CYFD until he was ready to be released to Respondents' care, custody and control. CYFD filed its response to the countermotion. In its response, CYFD resurrected the child pornography allegations against Respondents. CYFD argued that the fact the police department could not confirm the ages of the individuals in the pornographic images did not mean "that there are not pornographic images on the family computer that would self-evidently be of interest to persons with a sexual interest in very young girls who appear to be

16

prepubescent."[3] With no factual basis set forth as to date, location, content, or person making the representation, CYFD affirmatively stated that "[t]he [Hobbs] Police Department has represented to CYFD that they can also demonstrate that [the pornographic images were] viewed on the computer by [Father]" and that because Respondents "repeatedly have denied existence of pornography in the home or ability of [Son] to access it, unless due to actions of [H.J.,] . . . sexual issues of [Respondents] have never been addressed."

{33}     The termination of parental rights hearing, which had been rescheduled for February 2015, was reset for March 2015 due to a scheduling conflict of Mother's attorney. The termination hearing began on March 25, 2015, and lasted three days. Fourteen witnesses testified, including treatment providers, expert witnesses, Father, Daughter's foster mother, a detective from the Hobbs Police Department, and a CYFD social worker. None of the treatment providers or evaluators that testified (i.e., psychologists, therapists, counselors, etc.) evaluated or provided therapy to both Respondents *and* Daughter. Because the district court ultimately terminated Respondents' rights only as to Daughter, for the purposes of this appeal we focus on

---

[3] By March 2015, the CYFD attorney assigned to the case had been changed from Lee Huntzinger to Harold Pope. Unlike Mr. Pope, Ms. Huntzinger represented in 2012 that CYFD concurred that it was not possible to call the material found on the computer child pornography.

the testimony regarding Daughter and Respondents' progress. Testimony regarding Son, although extensive, generally does not ultimately assist this Court in evaluating whether Respondents caused the disintegration of their relationship with Daughter.

{34} We do note briefly that some of Son's treatment providers, including Dr. Marianne Westbrook, a provider to whom Son was referred in 2011, and Ruth Macy, a play therapist that met with Son in 2010, indicated that Son had disclosed to them either that he attempted to molest Daughter or expressed a desire to molest Daughter and that placing Daughter in the same home as Son would be risky. Marla Anaya, with whom Son met in 2013, similarly expressed concern that Son could be a danger to himself or others, including Daughter and Respondents, if released too soon. Son's most current therapist, Scott Gray, who had been seeing Son since 2014, stated that at the time of the hearing, Son's prognosis regarding boundaries and sexual encounters was guarded and that Son would need a lot of training and therapy.

{35} Dr. Christopher Alexander, a child psychologist, evaluated Daughter in 2014 when he was asked to provide a snapshot of how she was doing clinically, emotionally, and with overall attachment. He testified that because Daughter was removed from Respondents' home at such a young age and had not had regular contact with Respondents, the removal was not a stressor. Daughter was doing well with no major mental health diagnosis. She tested well academically and cognitively,

but needed stability. Dr. Alexander opined that Daughter's primary bond was with her foster parents. Although not tasked with offering opinions on Respondents' capabilities and deficiencies, Dr. Alexander expressed concerns about the underlying allegations and whether they had been dealt with. He stated that if Respondents were accepting of Son's antisocial sexualized behavior, that represented severe deviance. Dr. Alexander opined that if reunification were to be the plan, an investigative process about the allegations against Respondents should take place.

{36}    Ruth Macy, a licensed independent social worker and registered play therapist, who provided treatment for both Son and Daughter, was the only other treatment provider who testified about Daughter. Macy first saw Daughter after Daughter's then-foster mother had concerns about the fact Son had disclosed that he had touched Daughter "on the butt." Daughter was also referred because Respondents were concerned that Daughter might be traumatized as a result of not visiting with them. Macy testified that Daughter was "probably the . . . least traumatized child [she] had ever seen at that point." Macy indicated that Daughter never mentioned Respondents and was of the belief that her first foster mother was her biological mother. Daughter did not want to hear that Respondents were her biological parents, and Macy indicated that Daughter did not remember Respondents. Macy testified that despite experiencing some depression after her placement with her initial foster parents did

19

not work out, Daughter was excited about living with her new foster parents and expressed that she wanted them to be her mom and dad.

{37} Caroline Winters, Daughter's current foster mother, also testified. Winters testified that Daughter had been placed with her since 2014, that Daughter was previously placed with Winters' mother-in-law, and that if Daughter became available for adoption, she intended to adopt her. Winters indicated that Daughter referred to her and her husband as her parents, and Daughter referred to her initial foster mother as her "first mom." She testified that Daughter had never referred to her biological parents and that Daughter was upset about the termination of parental rights hearing.

{38} Three treatment providers testified during the hearing as to Respondents' progress, specifically, Blair Kemp, Marla Anaya, and Dr. Marc Caplan, the 706 expert and psychologist who evaluated Respondents in 2015.

{39} Kemp testified as to Respondents' treatment at the Guidance Center dating back to 2010. In addition to being the records custodian for the Guidance Center, Kemp served as Father's therapist and Respondents' couples and parenting counselor. The main focus of Respondents' treatment was parenting skills and safety planning. During therapy, Respondents and Kemp developed safety plans for the home, community, and educational environments. Kemp testified that Respondents completed their safety plans and goals in accordance with the treatment plan. In

20

Kemp's opinion, Respondents had met all of CYFD's requirements and were prepared to provide a safe environment with continued support.

{40} Kemp testified that Father had been seen at the Guidance Center approximately 140 times, and Mother had been seen about the same number of times. Kemp indicated that he would act as a special mediator in this case if ordered and described supervision/services that could be offered to the family if Children were returned to Respondents' home. Kemp could not attest to any danger that Son may pose to Daughter if Children were in the family home. Kemp testified that Respondents consistently showed up for appointments, actively participated in sessions, and seemed to be taking counseling seriously. However, Kemp admitted that Children's psychological conditions and issues would be factors that would affect the resolution of this case, and he could not comment on how reunification would affect Children. If Children were returned to Respondents' home, Kemp estimated that additional services would be needed for a minimum of six months. Kemp indicated that if in fact Respondents were watching pornography with Children or were aware that Son and H.J. were watching pornography together, that would be a concern that Kemp would want to address in therapy.

{41} Anaya also testified about Respondents, but her testimony focused on Respondents' progress as to Son. Anaya was providing individual therapy to Son and

family therapy to Son and Respondents in 2013-2014. Anaya testified that, when Respondents came to visit Son, they would bring electronics for Son to play with but that those electronics were disruptive. Eventually, Respondents were told to leave the electronic devices in the vehicle, and they complied. Anaya also testified that Son began acting out sexually once family therapy started. She felt that Son's interactions with Respondents were genuine but that Son did not feel safe in their home. Anaya noted that Respondents minimized Sons' issues and expressed concerns that Respondents were hitting a wall.

{42}     The final provider to testify about Respondents was Dr. Marc Caplan. Dr. Caplan did a parenting fitness evaluation for Respondents and generated reports regarding Mother and Father. Dr. Caplan testified that, based upon his testing, Mother had some idiosyncratic tendencies but that those tendencies did not rise to a pathological level. Dr. Caplan indicated that he was not concerned that Mother would be a danger to Children, and in terms of protecting Children, Mother had come a long way over the prior four or five years. Dr. Caplan stated that Mother was much more observant, insightful, and aware of some of the issues with Children to which she would have to attend. As far as Dr. Caplan could tell, Father seemed to have progressed as well, although he had fewer records regarding Father. Dr. Caplan expressed that Respondents were very committed to Children. Respondents knew

Children had special needs, and Dr. Caplan indicated that Respondents would need help and services. Dr. Caplan stated that there were risks with terminating Respondents' parental rights and with reunification but, in his opinion, the risk was less great with reunification. Dr. Caplan indicated that if Respondents knew Son and H.J. were watching pornography together or if Respondents knew that Son was acting out sexually and took no steps to address those issues, that would be of concern and might modify the risk assessment. As with Kemp, Dr. Caplan did not evaluate Children and admitted that the likelihood of success of reunification could vary depending on the degree of trauma Children experienced in the home.

{43}    Dana Becker, a CYFD employee who worked on the case, testified that even though she felt like Respondents followed the treatment plan, termination of parental rights was appropriate. As to Daughter, who at the time of the hearing was in her third foster care placement, Becker stated that she thought Daughter was bonded to her foster parents and indicated that Daughter wants a family, stability, and a home. Although Becker had no reason to disbelieve Kemp's testimony as to Respondents' progress, Becker was still concerned that Daughter could be harmed by Son and did not feel totally comfortable reunifying the family. With Daughter, Becker thought that termination was in her best interest because of the disintegration of the parent-child relationship. Becker testified that she thought CYFD was partly at fault for the

disintegration because of how long everything took. Becker blamed several people, including herself, for the delay.[4] However, Becker also noted issues with Respondents' marriage and problems with Respondents' minimizing Son's issues and their role in those problems.

{44} In April 2015, CYFD, the Guardian Ad Litem, and Respondents all filed requested or proposed findings of fact and conclusions of law. The district court entered its findings of fact and conclusions of law in July 2015.

{45} The district court concluded that Son and Daughter were abused and neglected by Respondents. In support of that conclusion, the court entered a number of findings chastising CYFD for not fully and timely informing the court of Mother's statements and actions, as well as Son's disclosures and behaviors. The court indicated that there was significant evidence that Respondents were sexual offenders, were responsible for what happened in their home, and that their actions resulted in Son's severe issues. The court found that one of the accounts on the computer contained over 1,000 photographic images of adult pornography and several photographic images of pornography depicting children under the age of eighteen. It found that Respondents

---

[4] A number of the treatment providers working on this case indicated either that certain providers were difficult to get in contact with or that the mediator did not coordinate the providers. Becker testified that she emailed the providers so that they had each others' contact information but also stated that the mediator did not follow through in this case.

were responsible for the pornographic content, both child and adult, on the computer. The court acknowledged that Respondents had participated in extensive therapy over the years, but indicated that CYFD never informed Respondents' therapists about the pornography-related disclosures and that the services offered to Respondents did not address the concerns created by the information Son disclosed. The district court attributed Respondents' lack of contact with Son to Respondents' "inability to follow very basic and straightforward visitation rules, and the deleterious effect that their visits would have on his treatment."

{46} The court outlined a number of issues Respondents failed to acknowledge and address but ultimately found that CYFD "utterly failed to properly assess the causes and conditions that led to [Respondents'] abuse of [Son]." The court further found that CYFD "never, with the directness commanded by the circumstances of this case, required [Respondents] to confront the conditions and causes of their abuse of [Children], and work to resolve them." Despite CYFD's "complete negligence[,]" the court found Respondents' "own failure, after hundreds of hours of individual, couples and parenting therapy, to perceive, and address the root of their problems[, which] has substantially contributed to a complete disintegration of the parent[-]child relationship, and makes it highly unlikely[] that they can ever have a normal parent[-]child relationship with [Son]."

25

{47}     Because CYFD "failed [to] properly assess the conditions and causes that led to [Respondents'] abuse and neglect of [Son]," the district court concluded that CYFD's "efforts to assist [Respondents] in adjusting those conditions [were] not . . . reasonable." Additionally, "[b]ecause [CYFD did] not engage[] reasonable efforts to assist [Respondents], it is unknown at [the time of the court's order] whether the conditions and causes of the abuse are likely to change in the foreseeable future." Therefore, despite the court's conclusions that Children were abused and neglected, Respondents' parental rights as to Daughter were not terminated on the basis of abuse or neglect.

{48}     The district court ultimately terminated Respondents' parental rights as to Daughter pursuant to Section 32A-5-15(B)(3), which creates, under defined circumstances, a presumption of parental abandonment. Regarding Daughter, the district court found that:

159.    [Daughter] has been placed in the care of her current foster family since April[] 2014.

160.    [Daughter] has had contact with, and been in the occasional care of her current foster family since late 2011.

161.    [Daughter] has not had any contact with her parents since July[] 2011, and no longer discusses or even mentions them.

162.    According to Macy, [Daughter] does not feel abandoned by [Respondents] because she has no recollection of them, and in fact denies that she has biological parents.

26

163. [Daughter] refers to her current foster parents as mom and dad, and has developed a strong bonded relationship with them.

164. When Macy visited with [Daughter] in her current foster home, [Daughter] became fearful because she believed that Macy was there to remove her from the home.

165. [Daughter] has expressed that she wants to be with her current foster parents and to be adopted by them.

166. [Daughter's] current foster parents desire to adopt her.

The court entered no findings as to Respondents' fault, if any, for the lack of contact with Daughter, or whether Respondents' actions or inactions contributed to or caused the disintegration of their parent-child relationship with Daughter. However, based on the aforementioned findings, the district court concluded that "[Respondents] are presumed to have abandoned [Daughter,]" and they "have not rebutted the presumption of abandonment."

{49} The court's judgment and order terminating Respondents' parental rights was entered in August 2015, more than five years after Children were taken into custody. This appeal followed.

**DISCUSSION**

{50} As indicated earlier in this opinion, we focus our opinion on Respondents' argument that the district court neither entered findings, nor is there any evidence,

27

that Respondents caused the disintegration of the parent-child relationship with Daughter, which is essential to the abandonment presumption.

## I.      Termination Based on Presumptive Abandonment

{51}      The standard of proof for termination of parental rights is clear and convincing evidence. *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. "Clear and convincing evidence" is defined as evidence that "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition[.]" *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 2, 120 N.M. 463, 902 P.2d 1066 (internal quotation marks and citation omitted). "The function of the appellate court is to view the evidence in the light most favorable to the prevailing party, and to determine therefrom if the mind of the fact[-]finder could properly have reached an abiding conviction as to the truth of the fact or facts found." *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (internal quotation marks and citation omitted).

{52}      The different bases for terminating parental rights are stated in Section 32A-4-28. One such basis is presumptive abandonment, the elements of which are outlined in Section 32A-4-28(B)(3). According to the statute,

> [t]he court shall terminate parental rights with respect to a child when[]

. . . .

        (3)    the child has been placed in the care of others . . . and the following conditions exist:

        (a)    the child has lived in the home of others for an extended period of time;

        (b)    the parent-child relationship has disintegrated;

        (c)    a psychological parent-child relationship has developed between the substitute family and the child;

        (d)    if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;

        (e)    the substitute family desires to adopt the child; and

        (f)    a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.

*Id.* "A finding by the court that all of the conditions set forth in Subparagraphs (a) through (f) . . . exist shall create a rebuttable presumption of abandonment." Section 32A-4-28(C). The presumption of abandonment, however, "is completely rebutted by showing that a parent lacks responsibility for the destruction of the parent-child relationship." *In re Adoption of J.J.B.*, 1995-NMSC-026, ¶ 47, 119 N.M. 638, 894 P.2d 994. Specifically, our Supreme Court in *Adoption of J.J.B.*, 1995-NMSC-026, ¶ 44, held that "two factors must both be established to prove abandonment: (1) parental conduct evidencing a conscious disregard of obligations owed to the child,

29

and (2) this conduct must lead to the disintegration of the parent-child relationship. We emphasize that both factors must be established to prove abandonment, and that evidence of the disintegration of the parent-child relationship is of no consequence if not caused by the parent's conduct." Thus, the party seeking termination of parental rights has the burden of proving "that the objective parental conduct [is] the cause of the destruction of the parent-child relationship." *Id.* ¶ 47.

{53}     Respondents argue on appeal that the district court improperly terminated their parental rights to Daughter based on presumptive abandonment because there was no finding and no evidence to support that Respondents caused the disintegration of their bond with Daughter. They argue that the reason their bond with Daughter disintegrated was because (1) the district court, at CYFD's urging, ordered that they have no contact with Daughter based on mistaken allegations about the contents of their home computer, and (2) because CYFD failed to act on the court-ordered reunification plan.

{54}     After pointing out the district court's lack of findings and conclusions regarding the cause of the disintegration of the parent-child relationship, Respondents argue that they rebutted the presumption of abandonment because the disintegration was caused by actions of CYFD. Respondents highlight the delay in analyzing the computer, CYFD's improper reliance on the "floating innuendo" of Respondents'

30

involvement in child pornography, and the months of inaction in carrying out a reunification plan. Respondents argue that while CYFD continued to make bureaucratic mistakes, Respondents continuously and zealously sought to have contact with Children but were not allowed visitation by order of the court. They argue that while CYFD dragged its proverbial feet, Respondents had addressed the issues that caused CYFD to intervene—by removing H.J., improving the condition of the home, bettering themselves with classes and counseling, and zealously seeking contact, visitation, and reunification in court. Respondents point out the district court's findings that CYFD mishandled the case and argue that Respondents were not the objective reason that Daughter was separated from Respondents for five years. Respondents also argue that because they continuously and earnestly worked for and litigated for reunification under Section 32A-4-28(B)(2), they cannot, as a matter of law, be said to have presumptively abandoned Daughter.

{55}     CYFD responds by first focusing on the plain language of the presumptive abandonment statute and argues that all of the conditions for presumptive abandonment occurred. CYFD agrees that, under *Adoption of J.J.B.*, Respondents' conduct must be the cause of the disintegration of the parent-child relationship, but argues that the law does not require CYFD to affirmatively prove that Respondents' conduct caused the disintegration. CYFD then argues that Respondents did not rebut

31

the presumption in this case for five reasons: (1) "it was the Hobbs Police Department not CYFD that seized the computer and was responsible for having it analyzed"; (2) "CYFD was interested in getting the results of the computer analysis, but had no control over the matter"; (3) CYFD based its concern about the contents of the computer on "testimony by a law enforcement officer [from 2011] that he . . . had seen images [on the computer] that he believed were child pornography" and that the forensics laboratory also suspected were child pornography; (4) it was never proved that "[the] images . . . were [not] child pornography," and in fact, the court found that the computer "contained images of child pornography"; and (5) there were over 1,000 images of adult pornography on the computer, and the record supports the court's finding that Son watched pornography with Respondents and H.J. Thus, according to CYFD, "[t]he action of the court to suspend visits with [Daughter] based in part on the fact that there was adult pornography and possible child pornography was reasonable."

{56} In support of its position, CYFD also highlights evidence about Son's behavioral issues and disclosures, and highlights the court's findings during various judicial reviews and permanency hearings that indicated that Respondents "had not made sufficient progress in alleviating the conditions and causes of abuse and neglect[.]" CYFD argues that given Son's behavioral issues, the danger posed to

32

Daughter, the Respondents' lack of progress and impact on Son, the allegations made against Respondents, and the detective's opinion that some of the pornography appeared to involve children, "the court was understandably concerned for the well-being of [Daughter] in the care of [Respondents]." According to CYFD, "[w]hile [Respondents] made efforts to comply with the treatment plan and did express continuing desire to visit with Children, ultimately it was a combination of the level of trauma caused to [Son] while in [Respondents'] home, the pornography on the computer, including what several people, including the judge who presided over the [termination of parental rights] hearing, concluded involved children, and [Respondents'] lack of progress as of July 2011, that led to the suspension of contact between [Respondents] and [Daughter] and the consequent disintegration of the parent-child relationship."

{57}     As a preliminary matter, we agree with Respondents that the district court did not enter any findings of fact or conclusions of law regarding the cause of the disintegration of the parent-child relationship between Daughter and Respondents. The only findings of fact regarding the termination of visitation and the disintegration of a parent-child relationship relate specifically to Son. The critical question that must be analyzed and resolved is whether, despite the lack of relevant findings of fact and conclusions of law, there is clear and convincing evidence that Respondents caused

the disintegration of the parent-child relationship with Daughter. Although the law does not necessarily support Respondents' position that actively participating in litigation prevents a conclusion of presumptive abandonment as a matter of law, we agree that under the particular facts of this case, there was not and cannot be a finding that Respondents caused the disintegration of their relationship with Daughter.

{58} Although we see the failures in this case as extending beyond just CYFD,[5] we agree with Respondents that there is no evidence that Respondents caused the delays that undoubtedly contributed to the disintegration of the parent-child relationship with Daughter. In this case, Children were taken into custody in June 2010. Over the course of the next year, the court held regular reviews, visits with Daughter were progressing, and Respondents had eventually progressed to unsupervised overnight weekend visits. Despite the fact that there were no documented issues with Daughter's visitation, all visitation with Daughter was suspended in July 2011 after a hearing in which a detective testified that some of the pornographic images found on Respondents' computer appeared to include individuals under the age of eighteen.

---

[5] CYFD's argument that it was not only to blame for the delays in this case is misguided and does not assist this Court in analyzing whether Respondents rebutted the presumption of abandonment. The consideration under *Adoption of J.J.B.*, 1995-NMSC-026, ¶ 47, is whether "a parent lacks responsibility for the destruction of the parent-child relationship." We are not required to evaluate and assign fault to parties other than the parents to determine that the presumption is rebutted.

34

At that point and even though the investigation was not complete, the permanency plan was changed to adoption.

{59} After CYFD filed its initial motion for termination of parental rights, Respondents, in September 2011, petitioned the court for visitation in order "to avoid damage to the [parent-child] relationship[.]" Despite Respondents' request, visitation was not provided. Respondents again requested visitation when they filed a motion for summary judgment in June 2012. In that motion, Respondents provided the court with a report from the Hobbs Police Department indicating that the images "could not be identified as child pornography." However, the district court continued to deny visitation with Daughter in July 2012 primarily because Daughter's therapist testified that it would be confusing for Daughter.

{60} After ordering that Respondents have no contact with Daughter for over a year and after the permanency plan was changed back to reunification, the district court appointed a mediator in early 2013 to assist on the case and to "control the various aspects of the family therapy intervention including . . . parent and child visitation[.]" The mediator completely failed to address visitation and contact with Daughter never resumed.

{61} The evidence does not support the district court's conclusion that Respondents caused the disintegration of the parent-child relationship with Daughter. There is no

evidence in the record that visitation with Daughter was being withheld because Respondents acted improperly during the visits, and CYFD makes no such allegations on appeal. In fact, the only testimony about Respondents' behavior during visitation was from the program manager of Family Time Services, who testified that there were no issues during the Respondents' supervised visitation with Daughter. By all accounts, visitation in this case was initially suspended based on a questionable allegation and was then continually suspended out of fear of confusing Daughter and due to inexcusable administrative and judicial inaction.

{62} We are deeply troubled by the fact that all visitation, including supervised visitation, with Daughter was revoked based on an allegation and withheld for years while CYFD attempted to substantiate that allegation. What is even more troubling is the fact that this separation allowed Daughter to lose all memory of Respondents after years of no contact. CYFD then used the same lack of contact as the primary basis for asserting a disintegration of the parent-child relationship in order to terminate Respondents' parental rights. Respondents repeatedly petitioned the district court to allow visitation and even predicted that the lack of visitation could damage the parent-child relationship. Aside from the continual requests to the court to reconsider visitation, requests that are well documented in the record, we see no other way that Respondents could have tried to prevent the disintegration of their

relationship with Daughter. Once visitation was suspended in this case, preventing the inevitable disintegration was beyond Respondents' control. *See Adoption of J.J.B.*, 1995-NMSC-026, ¶ 47 ("Proof of abandonment requires that the objective parental conduct be the cause of the destruction of the parental-child relationship.").

{63} We also note that the district court's findings that CYFD "utterly failed" and that CYFD "never, with the directness commended by the circumstances of this case, required [Respondents] to confront the conditions and causes of their abuse of [Children], and work to resolve them[,]" undercuts CYFD's argument that Respondents were at fault. Even if we consider Respondents' slow progress in 2010-2011, how can suspension of all visitation and the consequent disintegration of the parent-child relationship be blamed on Respondents when CYFD was so unclear about what it required of Respondents? Because Respondents did not cause the disintegration of the parent-child bond with Daughter and consistently tried to prevent the disintegration of that relationship from occurring, we hold that Respondents rebutted the presumption of abandonment. *See id.*

**II.    Best Interest of Daughter**

{64} Although we reverse the district court's judgment and order terminating parental rights as to Daughter, we still are tasked with the very real issue of Daughter's future. We recognize that in termination proceedings there is often a

tension between "the physical, mental and emotional welfare and needs of the child," Section 32A-4-28(A), and the understanding that "parental rights are among the most basic rights of our society and go to the very heart of our social structure." *State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2007-NMCA-070, ¶ 34, 141 N.M. 692, 160 P.3d 601 (internal quotation marks and citation omitted). We are faced with the prospect of completely disrupting the life of a young child who has lived with a family with whom she has bonded and by whom she wishes to be adopted. However, as noted in *Lance K.*, 2009-NMCA-054, ¶ 41, "we also are sympathetic to the fact that, but for the erroneous termination of [Respondents'] parental rights, [they] might not be in the position that [they are] now." (Alteration, internal quotation marks, and citation omitted.) As in *Adoption of J.J.B.*, this case "offers no truly acceptable choice. Instead, [the appellate court] must be resigned to a solution that causes the least amount of harm." 1995-NMSC-026, ¶ 65.

{65}     The method for determining how to address the aforementioned tensions and conundrums is addressed in *Adoption of J.J.B.*, 1995-NMSC-026, ¶¶ 55-71, and *Lance K.*, 2009-NMCA-054, ¶¶ 41-49. As explained in *Adoption of J.J.B.*, in cases where a termination is reversed, ultimate resolution of the case lies "in deciding the best interests of the child when a biological parent-child relationship is at issue." 1995-NMSC-026, ¶ 55. "A finding that parental rights were improperly terminated

38

does not mechanically result in the award of custody to the biological parents. The termination of parental rights and the determination of custody are different issues and must be addressed separately." *Id.* ¶ 57. Although there is a presumption in New Mexico that custody should be awarded to the natural parent based on the premise "that it is in the child's best interests to be raised by his or her biological parents[,] . . . this presumption is never conclusive." *Id.* ¶ 58 (citations omitted). "Custody based upon the biological parent-child relationship may be at odds with the best interests of the child[,]" and "[w]hen that happens, the best interests of the child must prevail." *Id.* "A parent's right is not absolute and under extraordinary circumstances, custody of a child may be awarded to a nonparent over objections of a parent." *Id.* ¶ 59. Furthermore, any such parental right is secondary to the best interest and welfare of Daughter. *See In re Samantha D.*, 1987-NMCA-082, ¶ 11, 106 N.M. 184, 740 P.2d 1168.

{66}     "It is clear that the district court is in the best position to determine the present circumstances of [Daughter] and [Respondents] and to balance the emotional interests of [Daughter] and [Respondents'] rights." *Lance K.*, 2009-NMCA-054, ¶ 41. Because "such a decision cannot be based upon the written appellate record[,]" *Adoption of J.J.B.*, 1995-NMSC-026, ¶ 66, we remand this case to the district court for a custody determination. In deciding who ought to retain custody of Daughter, the district court

should consider whether there are extraordinary circumstances that warrant depriving Respondents of custody. *See Lance K.*, 2009-NMCA-054, ¶ 47. "[I]f the non-parent party (here, CYFD) establishes that extraordinary circumstances exist, the presumption favoring custody in the natural parent is rebutted." *Id.*

{67} In *Adoption of J.J.B.*, our Supreme Court outlined a number of situations that could constitute extraordinary circumstances, including: (1) a showing of "serious parental inadequacy with clear and convincing evidence[,]" including "degeneration from parental competence to parental unfitness . . . by clear and convincing evidence"; and (2) "if the child's contact with the biological parents has been so minimal that he or she has significantly bonded with the adoptive parents." 1995-NMSC-026, ¶¶ 59-61. "Once extraordinary circumstances are shown by clear and convincing evidence, the court should then make a determination based on the best interests of the child." *Id.* ¶ 62.

{68} First, in making its determination, the district court "should evaluate whether there is clear and convincing evidence of gross misconduct such as incapacity, moral delinquency, instability of character, or inability to provide [Daughter] with needed care." *Id.* ¶ 67. Second, the court "should determine whether . . . [Respondents are] capable of reestablishing a healthy parent-child bond with [Daughter]. If, despite the development of a psychological parent-child relationship between the [foster] parents

and [Daughter], a psychological parent-child relationship can be restored between [Respondents] and [Daughter], then granting custody to [Respondents] is in the best interests of [Daughter]." *Id.* ¶ 68.

{69} In making its custody determination, we remind the district court that Respondents continue to have parental rights in Son, who could return home at some point in the future. The circumstances regarding H.J.'s molestation of Son and the pornography in the home did not occur in a vacuum, but both failed to be adequately addressed by CYFD in Respondents' previous treatment plan. We urge the district court to become reacquainted with the evidence presented at the termination hearing regarding the trauma suffered by Son, the behaviors learned and exhibited by Son, and Parents' role in any abuse and neglect of Children. As noted by our Supreme Court, Daughter's best interest may be served by applying more equitable principles, and the district court should consider any future temporary, as well as permanent, custody arrangements. *See id.* ¶¶ 69-70. On remand, we encourage the district court to carefully consider all these factors in making a custody determination regarding Daughter, keeping in mind that the court's primary consideration is "to provide for the care, protection and wholesome mental and physical development" of Daughter. NMSA 1978, § 32A-1-3(A) (2009).

## III.  Attorney Fees

{70}  Respondents request that this Court order that Petitioner pay all of their attorney fees, as well as related taxes and costs, as a sanction for delays in analysis of the evidence, lack of good faith efforts to support reunification, and bad faith use of "innuendo" to achieve termination. They also request reimbursement for any and all expenses paid to Dr. Caplan.

{71}  "[G]enerally speaking, an award of attorney fees is a matter for the district court's discretion." *Khalsa v. Puri*, 2015-NMCA-027, ¶ 72, 344 P.3d 1036. "Courts have the inherent power, independent of statute or rule, to award attorney fees to vindicate their judicial authority and compensate the prevailing party for expenses incurred as a result of frivolous or vexatious litigation." *Landess v. Gardner Turf Grass, Inc.*, 2008-NMCA-159, ¶ 19, 145 N.M. 372, 198 P.3d 871 (alteration, internal quotation marks, and citation omitted). Additionally, "[d]istrict courts have the inherent authority to impose a variety of sanctions on both litigants and attorneys in order to regulate their docket, promote judicial efficiency, and deter frivolous filings." *Harrison v. Bd. of Regents of Univ. of N.M.*, 2013-NMCA-105, ¶ 2, 311 P.3d 1236 (internal quotation marks and citation omitted).

{72}  Although we may award costs and attorney fees related to an appeal under Rule 12-403 NMRA, Respondents have not requested appellate-related fees and costs.

Respondents are requesting that this Court award costs and attorney fees incurred at the district court level. However, Respondents in their brief in chief do not specifically direct this Court to portions of the record in which they requested that the district court award attorney fees and costs, and therefore the issue has not been preserved for appellate review. *See Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record. The mere assertions and arguments of counsel are not evidence." (internal quotation marks and citation omitted)); *see also Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 24, 314 P.3d 688 ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." (internal quotation marks and citation omitted)). Insofar as Respondents are asking this Court to order Petitioner to pay Respondents' costs and attorney fees incurred during the course of litigation as a sanction despite the lack of preservation, we decline to do so. Imposing such a sanction would necessarily require this Court to make findings of fact regarding CYFD's actions before the district court and would require this Court to exercise discretion generally reserved for the district court. *See Khalsa*, 2015-NMCA-027, ¶ 72. Respondents provide no legal authority that would support such an imposition by this Court. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M.

764, 676 P.2d 1329 (recognizing that the appellate courts "assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority" and stating that the appellate courts "will not do this research for counsel"). If Respondents seek such relief, that request should be made before the district court.

**CONCLUSION**

{73}    For the reasons outlined in this opinion, we reverse the district court's judgment and order terminating Respondents' parental rights to Daughter. However, due to the lack of contact between Daughter and Respondents, we remand the matter to the district court to carefully consider the matter of custody as provided in Section II herein. Until the district court makes the final legal and physical custodial determination, CYFD shall have immediate temporary legal custody, and Daughter's foster placement may remain with the current foster parents.

{74}    **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**

_____
**M. MONICA ZAMORA, Judge**

44